866 F.2d 1304
 UNITED STATES of America, Plaintiff-Appellee,
v.
George N. MEROS, John Frazier, a/k/a J.J., Michael
Ferrentino, Linda Deemer Ferrentino, Michael Rubenstein,
Achilles Nick Vaseliades, Bernard H. Johnson, Robert
English, Albert H. Papolos, Stephen P. Papolos, Robert J.
Papolos, Defendants-Appellants.
 No. 85-3774.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 13, 1989.
 
 D. Frank Winkles, Winkles, Trombley, Kynes & Markman, Tampa, Fla., for Rubenstein.
 J. Stanford Lifsey, Tampa, Fla., for Vaseliades.
 Jack Helinger, St. Petersburg, Fla., for Albert Papolos.
 Edward T. Garland, Atlanta, Ga., Ernon N. Sidaway, III, Fort Pierce, Fla., Edward A. Carhart, Coral Gables, Fla., Tom McCoun, Frank Louderback, St. Petersburg, Fla., Karen Berkowitz, Portland, Or., John R. Hesmer, Marietta, Ga., W. Thomas Dillard, Ritchie, Fels & Dillard, Knoxville, Tenn., for defendants-appellants.
 Terry Flynn, Asst. U.S. Atty., Carol Wilkinson, Sp. Atty., Dept. of Justice, Tampa, Fla., for U.S.
 Appeal from the United States District Court for the Middle District of Florida.
 Before TJOFLAT, VANCE and COX, Circuit Judges.
 PER CURIAM:
 
 I.
 
 1
 Between 1976 and 1984, the appellants in this case participated in a series of attempts to smuggle large quantities of marijuana into the United States from Colombia. The "kingpins" behind these ventures included George Meros, an attorney who supplied financial backing for the ventures, and the Papolos brothers, who organized the distribution of the smuggled marijuana. In addition to financing the smuggling operations, Meros also provided his associates with individual financial assistance, structuring cash transactions so as to avoid the filing of Currency Transaction Reports, and establishing Swiss bank accounts to conceal the profits of the smuggling operations.
 
 
 2
 After a lengthy trial, the jury found the participants in these ventures guilty of various violations against the anti-racketeering and narcotics laws of the United States.[1] In addition, the jury found Meros and Robert Papolos guilty of various money laundering offenses.[2] Appellants now bring a host of challenges to their convictions. Three of the appellants' contentions raise issues that have some precedential value; we discuss them in turn.[3]
 
 II.
 A.
 
 3
 Appellants John Frazier, Michael Ferrentino, Linda Ferrentino, and Stephen Papolos argue that they are entitled to a new trial on grounds that the prosecutor allegedly violated his obligation to disclose impeaching evidence regarding one of his witnesses and knowingly permitted that witness to testify falsely at trial. The facts pertinent to this claim are as follows.
 
 
 4
 Alexander Biscuiti, a co-conspirator who had entered into a plea agreement with the Government and had been sentenced to prison by the district court, was the Government's principal witness in support of its claim that appellants imported 80,000 pounds of marijuana from Colombia in July 1981. Prior to trial, appellants moved the court to compel the prosecutor to disclose all information of an impeaching nature regarding Biscuiti and all inducements or promises the Government made to him in return for his testimony. The court ordered the Government to supply the requested information to the extent required by the Supreme Court's holdings in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The prosecutor responded by apprising appellants of the existence of a transcript of Biscuiti's September 7, 1984 bail hearing. At this hearing, Biscuiti sought to reduce the one and one-half million dollar bond that the court had previously required him to post. The Government, however, contended that the court should deny Biscuiti's motion to reduce the amount of his bond on the grounds that Biscuiti associated with a violent crowd and that he had been reluctant to surrender himself to the authorities upon the issuance of a warrant for his arrest. The Government also gave appellants an unredacted copy of a tape-recorded phone conversation between Biscuiti and his associate, Joey Cam, who had since been the victim of a "gangland-style murder."
 
 
 5
 Before Biscuiti was called to the stand at trial, appellants learned that Biscuiti was a Government witness in another criminal case, pending in the Northern District of Georgia, and that he had recently been indicted in a drug prosecution in the Eastern District of Pennsylvania. Appellants' counsel informed the court of these matters and moved the court to compel the Government to make available all information relating to the Georgia and Pennsylvania cases which would tend to impeach Biscuiti in the present case, including any negotiations or deals the Government may have made with him. In response to the court's inquiry, the prosecutor stated that the Government had not entered into any plea agreement with Biscuiti regarding the Atlanta case, and with regard to the Pennsylvania case, he declared:
 
 
 6
 I submit to the court that any negotiations between this witness' attorney and law enforcement or prosecutorial officials regarding another indictment in another [jurisdiction] that has not been reduced to writing and that may or may not be in the works or in the preliminary stages is not [Brady or Giglio material]. It's not anything in our possession and it's, quite frankly, none of our business.
 
 
 7
 The court accordingly denied appellants' motion on the grounds that the requested information was not in the Government's possession for purposes of Brady and that the information was known and available to the defense.
 
 
 8
 At trial, Biscuiti testified that he had voluntarily turned himself in to the authorities upon learning of the existence of a warrant for his arrest. A few days after the conclusion of Biscuiti's testimony and cross-examination, appellants obtained from the court reporter the transcript of Biscuiti's bond reduction hearing, at which the Government had argued that Biscuiti's surrender had been "reluctant." Appellants moved the court to reopen the cross-examination of Biscuiti based on the content of the transcript of the hearing or else to declare a mistrial. The district court denied appellants' motion on the ground that appellants had already conducted an exhaustive four-day cross-examination of Biscuiti which covered every conceivable facet of his life including the circumstances of his surrender upon learning of the warrant for his arrest.
 
 
 9
 Appellants contend that the prosecutor violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to provide the defense with evidence upon which the Government had based its arguments at the bond reduction hearing and by failing to apprise defense of alleged plea negotiations between Biscuiti and the Georgia and Pennsylvania authorities. Appellants also argue that the prosecutor violated Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), by failing to correct Biscuiti's allegedly false testimony that he had turned himself in upon learning of the warrant for his arrest. We discuss these issues in order.
 
 1.
 
 10
 In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87, 83 S.Ct. at 1196-97. The Supreme Court has determined that "[i]mpeachment evidence, [ ] as well as exculpatory evidence, falls within the Brady rule." See United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). To establish a Brady violation a defendant must prove the following: (1) that the Government possessed evidence favorable to the defendant (including impeachment evidence), see id.; (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence, see United States v. Valera, 845 F.2d 923, 927-28 (11th Cir.1988); (3) that the prosecution suppressed the favorable evidence, see United States v. Burroughs, 830 F.2d 1574, 1577 (11th Cir.1987), cert. denied sub nom. Rogers v. United States, --- U.S. ----, 108 S.Ct. 1243, 99 L.Ed.2d 442 (1988); and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different, see Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.
 
 
 11
 With respect to the allegation that the Government suppressed impeaching evidence upon which it based its arguments at Biscuiti's bond reduction hearing, we conclude that appellants have failed to make the requisite showing to establish a violation of Brady. Our review of the transcript of the hearing convinces us that the alleged nondisclosed evidence never existed. Rather, the Government told the court during the hearing that its arguments were based solely on the tape recorded conversation between Biscuiti and Joey Cam--made available to the defense prior to trial--and on the testimony of Special Agent Robert Mazur of the United States Customs Service. That the defense did not promptly obtain from the court reporter the transcript of Mazur's testimony and the Government's arguments at the hearing is of no moment since defense counsel had been informed prior to trial of the existence of the allegedly favorable information but did not pursue it. As we stated in Valera, " '[T]he government is not obliged under Brady to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.' " 845 F.2d at 928 (quoting United States v. Prior, 546 F.2d 1254, 1259 (5th Cir.1977)).
 
 
 12
 Appellants' allegations concerning possible plea negotiations between Biscuiti and the Georgia and Pennsylvania authorities similarly fail to meet the requirements of Brady. The district court noted that defense counsel, through conversations with Biscuiti's attorney, had apparently learned more about Biscuiti's involvement in the Georgia and Pennsylvania cases than had the prosecutor. Therefore, no Brady violation could have occurred since defense counsel knew, prior to Biscuiti taking the witness stand, that Biscuiti might have been engaging in plea negotiations with Georgia and Pennsylvania authorities and was in as good a position as the prosecutor to learn more about such negotiations through reasonably diligent efforts. See Valera, 845 F.2d at 927-28.
 
 
 13
 In addition, the information in question was not, as required by Brady, in the possession of the Government. Brady and its progeny apply to evidence possessed by a district's " 'prosecution team,' which includes both investigative and prosecutorial personnel." See United States v. Antone, 603 F.2d 566, 569 (5th Cir.1979) (citations omitted).[4] Brady, then, applies only to information possessed by the prosecutor or anyone over whom he has authority. A prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find potentially impeaching evidence every time a criminal defendant makes a Brady request for information regarding a government witness. In this case, the record shows that the prosecutor searched for any promises that may have been made in the Northern District of Georgia and the Eastern District of Pennsylvania, and found none. Under these circumstances, we hold that the prosecutor carried out his obligations under Brady.
 
 2.
 
 14
 When a witness conceals, through false testimony, his bias against the defendant, and the Government knows the witness has testified falsely, the Government has a duty to correct the false statement. See United States v. Rivera Pedin, 861 F.2d 1522, 1529 (11th Cir.1988); see also Bagley, 473 U.S. at 678-80, 105 S.Ct. at 3381-82; Giglio, 405 U.S. at 154, 92 S.Ct. at 766. Appellants allege that the prosecutor knew that Biscuiti was testifying falsely when he stated on cross-examination that he had turned himself in voluntarily after learning of the warrant for his arrest. Appellants contend that the prosecutor committed a violation of Giglio by allowing this allegedly false testimony to go uncorrected and that their convictions must therefore be reversed. We disagree.
 
 
 15
 Simply put, there has been no violation of Giglio in this case since Biscuiti's testimony that he voluntarily turned himself in was true. Contrary to appellant's contention, the record does not suggest that during Biscuiti's bond reduction hearing the Government argued that Biscuiti was apprehended when he was on the verge of fleeing the state. Rather, the transcript of the bail hearing reveals only that the Government argued that the court should not reduce Biscuiti's bond because he had not turned himself in until several weeks after learning of the warrant for his arrest. The prosecutor obviously has no duty to correct that which is not false. Moreover, even if the transcript of the hearing had demonstrated that Biscuiti lied when he testified at trial that he had turned himself in, such testimony would not have fallen within the aegis of the rule of Giglio and its progeny since the testimony did not involve a source of potential bias against the defendant. Only in cases in which the witness' false testimony conceals his possible bias against the defendant have we found Giglio 's mandate applicable. See United States v. Rivera Pedin, 861 F.2d 1522, 1529-30 (11th Cir.1988) (false testimony that witness had not tried to solicit a bribe from defendant); Moore v. Kemp, 809 F.2d 702, 719-20 (11th Cir.) (en banc), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987) (false testimony that witness had not been given immunity from prosecution); Williams v. Griswald, 743 F.2d 1533, 1541-42 (11th Cir.1984) (false testimony that witness was under no pressure from anyone to testify); United States v. Antone, 603 F.2d 566, 567 (5th Cir.1979) (false testimony that witness' attorney's fees were not being paid by the state). In sum, we find no violation of Brady or Giglio.
 
 B.
 
 16
 The jury found that appellant Meros structured certain financial transactions to avoid the filing of Currency Transaction Reports (CTR's), which inform the federal government of transactions involving over $10,000. See generally 31 U.S.C. Secs. 5311-5322 (1982 & Supp. IV 1986). These transactions were of two types: first, a series of multiple transactions involving amounts under $10,000 made on the same day at different banks that totaled over $10,000 when aggregated; second, a series of multiple transactions involving amounts under $10,000 made on the same day at different branches of a single bank that totaled over $10,000 when aggregated. The United States maintained that such actions violated 18 U.S.C. Secs. 2, 1001 (1982) and 31 U.S.C. Secs. 1081, 1059 (1976) (now codified as amended at 31 U.S.C. Secs. 5313(a), 5322(b) (1982 & Supp. IV 1986)).
 
 
 17
 On appeal, Meros contends that his actions were not illegal for the following reasons. First, Meros argues that the law imposes no duty on customers of financial institutions to ensure that the institution files a CTR; therefore, even if the bank failed in its duties, Meros' actions were not criminal. Second, even if the law did impose such a duty, Meros argues that his actions did not cause the involved institutions to fail to file CTR's. Third, Meros argues that our cases have found such causation only when the customer's actions were fraudulent or deceitful; because his actions were done openly, without any attempt to conceal his identity, Meros argues that he cannot be a proximate cause of the banks' failure to file the CTR's. Finally, Meros argues that he had no notice that his actions were criminal.
 
 
 18
 In 1981--the year in which these transactions occurred--the currency laws of the United States provided as follows:
 
 
 19
 Whoever willfully violates any provision of this chapter ["Reports of Currency and Foreign Transactions"] where the violation is--
 
 
 20
 (1) committed in furtherance of the commission of any other violation of Federal law, or
 
 
 21
 (2) committed as part of a pattern of illegal activity involving transactions exceeding $100,000 in any twelve-month period,
 
 
 22
 shall be fined not more than $500,000 or imprisoned not more than five years, or both.
 
 
 23
 31 U.S.C. Sec. 1059 (1976) (recodified, as amended, at 31 U.S.C. Sec. 5322 (1982 & Supp. IV 1986)).
 
 
 24
 Transactions involving any domestic financial institution shall be reported to the Secretary at such time, in such manner, and in such detail as the Secretary may require if they involve the payment, receipt, or transfer of United States currency, or such other monetary instruments as the Secretary may specify, in such amounts, denominations, or both, or under such circumstances, as the Secretary shall by regulation prescribe.
 
 
 25
 31 U.S.C. Sec. 1081 (1976) (recodified, as amended, at 31 U.S.C. Sec. 5313 (1982)). Our precedent makes clear that the regulations promulgated pursuant to these provisions, see 31 C.F.R. Sec. 103 (1981), solely regulate financial institutions, not customers of those institutions. See United States v. Tobon-Builes, 706 F.2d 1092, 1097 (11th Cir.1983) (noting, however, that the statute itself would allow the Secretary to impose the same duties on customers).
 
 
 26
 Nevertheless, the scope of the criminal liability for violations of these currency laws is wider than the scope of the regulatory scheme. The criminal laws of the United States provide that:
 
 
 27
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 
 
 28
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
 
 
 29
 18 U.S.C. Sec. 2 (1982).
 
 
 30
 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 31
 18 U.S.C. Sec. 1001 (1982). This circuit has repeatedly recognized that actions by a customer that cause a financial institution to abrogate its duty to file a CTR are criminal, in violation of these provisions. See United States v. Cure, 804 F.2d 625 (11th Cir.1986); United States v. Giancola, 783 F.2d 1549 (11th Cir.), cert. denied, 479 U.S. 1018, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986); United States v. Denemark, 779 F.2d 1559 (11th Cir.1986); United States v. Tobon-Builes, 706 F.2d 1092 (11th Cir.1983); United States v. Thompson, 603 F.2d 1200 (5th Cir.1979). Contra United States v. Gimbel, 830 F.2d 621 (7th Cir.1987); United States v. Larson, 796 F.2d 244 (8th Cir.1986); United States v. Reinis, 794 F.2d 506 (9th Cir.1986).[5]
 
 
 32
 Count fourteen of the indictment in this case charged Meros with violating 18 U.S.C. Sec. 1001 (1982) by making multiple purchases of cashier's checks under $10,000 at different banks on the same day. Before 1982, title 31 imposed a duty to file CTR's only upon individual financial institutions. Thus, in United States v. Denemark, 779 F.2d 1559 (11th Cir.1986), we held that multiple transactions at different banks on the same day, none of which exceeded $10,000 at an individual institution, did not violate the provisions of section 1001. The various institutions had no duty to report the transactions; the customer's structuring of his transactions in amounts under $10,000 therefore did not cause the banks to abrogate any duty. Appellant Meros' conviction on count fourteen must therefore be reversed.
 
 
 33
 Meros' other convictions were predicated on a series of transactions in amounts under $10,000 made on the same day at different branches of the Landmark Bank. We are convinced that Meros' actions fall within the scope of criminal liability established by our previous decisions. These decisions clearly hold that a customer can be the proximate cause of a bank's failure to file a CTR, and thus liable. See United States v. Cure, 804 F.2d 625 (11th Cir.1986); United States v. Giancola, 783 F.2d 1549 (11th Cir.1986); United States v. Tobon-Builes, 706 F.2d 1092 (11th Cir.1983). Moreover, while fraudulent or deceptive conduct may aggravate the illicit nature of the offense, we do not think such conduct is necessary for liability under title 18: it is enough that the customer "induces" an offense against the United States, 18 U.S.C. Sec. 2(a) (1982), or participates in a scheme to conceal a material fact. See 18 U.S.C. Sec. 1001 (1982). Finally, we note that Meros, a practicing attorney for over twenty years, was given adequate notice in 1981 of the criminal nature of his conduct by both statute and a previous decision of this court, then part of the Fifth Circuit. See United States v. Thompson, 603 F.2d 1200 (5th Cir.1979). With the exception of count fourteen, Meros' convictions arising out of these financial transactions are therefore affirmed.
 
 C.
 
 34
 Appellants Stephen Papolos, Robert English, Michael Ferrentino, and Bernard Johnson were each convicted of violating 21 U.S.C. Sec. 841(a) (1982), which makes it an offense to distribute over 1000 pounds of marijuana. Each appellant was sentenced to terms of incarceration ranging from two to fifteen years, fined various amounts, and given a special parole term of two years.
 
 
 35
 At the time of appellants' offenses,[6] section 841 read as follows:
 
 
 36
 (b) Penalties
 
 
 37
 Except as otherwise provided in section 845 of this title, any person who [distributes a controlled substance] shall be sentenced as follows:
 
 
 38
 ....
 
 
 39
 (1)(B) In the case of a controlled substance in schedule I [i.e. marijuana] or II which is not a narcotic drug ... such person shall, except as provided in paragraphs (4), (5), and (6) of this subsection, be sentenced to a term of imprisonment of not more than 5 years, a fine of not more than $15,000, or both.... Any sentence imposing a term of imprisonment under this paragraph shall, in the absence of [ ] a prior conviction, impose a special parole term of at least 2 years in addition to such term of imprisonment....
 
 
 40
 ....
 
 
 41
 (6) In the case of [the distribution of a controlled substance] involving a quantity of marihuana exceeding 1,000 pounds, such person shall be sentenced to a term of imprisonment of not more than 15 years, and in addition, may be fined not more than $125,000.
 
 
 42
 21 U.S.C. Sec. 841(b) (1982). Appellants contend that since their offense is controlled by the penalties imposed by section 841(b)(6), they are not subject to the two-year parole term imposed by section 841(b)(1)(B). The United States vehemently disagrees, arguing that such an interpretation would have the anomalous result that the two year parole term would affect only small-time traffickers, while the kingpins would escape the penalty.
 
 
 43
 Congress amended 21 U.S.C. Sec. 841(b) in 1980 to add section (b)(6). See Infant Formula Act of 1980, Pub.L. No. 96-359, Sec. 8(c), 94 Stat. 1190, 1194. The legislative history accompanying the amendment indicates that Congress intended to increase the penalties for offenses involving large amounts of marijuana in order to deter large scale trafficking. Significantly, the legislative history does not mention the special parole term, although the other possible penalties are discussed. See S.Rep. No. 916, 96th Cong., 2d Sess. 14, reprinted in 1980 U.S.Code Cong. & Admin.News 2858, 2871; H.R.Rep. No. 936, 96th Cong., 2d Sess. 13 (1980).
 
 
 44
 When interpreting a criminal statute, the "rule of lenity" requires strict construction. See United States v. Rojas, 671 F.2d 159, 163 (5th Cir. Unit B 1982).[7] Although the result may appear incongruous, we conclude that Congress could have believed that the stiffer penalties provided for in section 841(b)(6) were a sufficient deterrent and that a special parole term was not necessary. In light of this possible rationale, we conclude that individuals sentenced under 21 U.S.C. Sec. 841(b)(6) may not be given a special parole term. The district court erred in so sentencing the appellants. Because the district court may have taken the special parole term into account in fashioning appellants' sentences under 21 U.S.C. 841(b)(6), we vacate those sentences and remand for resentencing.
 
 III.
 
 45
 In conclusion, the conviction of appellant Meros under count fourteen is reversed. In addition, we vacate the sentences imposed on appellants Stephen Papolos, Robert English, Michael Ferrentino, and Bernard Johnson under 21 U.S.C. Sec. 841(b)(6). In all other respects, the appellants' convictions are affirmed.
 
 
 46
 AFFIRMED IN PART; REVERSED IN PART; AND VACATED AND REMANDED IN PART.
 
 
 
 [1]
 The drug-related charges of the indictment and the resulting verdicts are as follows
 Counts one and two charged appellants George Meros, Robert Papolos, Stephen Papolos, Albert Papolos, Michael Ferrentino, and Bernard Johnson with violating and conspiring to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1962(c), (d) (1982). All were found guilty of RICO conspiracy, save Johnson and two other defendants. Meros and Robert Papolos were convicted of the substantive RICO charge.
 Counts three, four, and five charged George Meros with conspiracy to possess marijuana with intent to distribute, 21 U.S.C. Secs. 841(a)(1), (b)(6), 846 (1982), conspiracy to import marijuana, 21 U.S.C. Secs. 952(a), 963 (1982), and possession of marijuana with intent to distribute. 21 U.S.C. Sec. 841(a)(1) (1982); 18 U.S.C. Sec. 2 (1982). Meros was found guilty on all three counts.
 Count six charged Robert Papolos, Stephen Papolos, Albert Papolos, Michael Ferrentino, Bernard Johnson and Achilles Nick Vaseliades with importation of marijuana. 21 U.S.C. Sec. 952(a) (1982); 18 U.S.C. Sec. 2 (1982). Robert Papolos, Stephen Papolos, Ferrentino, Johnson, and Vaseliades were found guilty. Albert Papolos and two other defendants were acquitted.
 Count seven charged Robert Papolos, Stephen Papolos, Albert Papolos, Michael Ferrentino, Bernard Johnson, Achilles Nick Vaseliades, John Frazier, Robert English and Michael Rubenstein with possession of marijuana in excess of 1000 pounds with intent to distribute. 21 U.S.C. Sec. 841(a)(1) (1982); 18 U.S.C. Sec. 2 (1982). All but Albert Papolos, Vaseliades, and one other defendant were convicted.
 Count eight charged Robert Papolos, Stephen Papolos, Albert Papolos, Michael Ferrentino, Bernard Johnson, Achilles Nick Vaseliades, John Frazier, Robert English, Michael Rubenstein, and Linda Ferrentino with conspiracy to possess marijuana in excess of 1000 pounds with intent to distribute. 21 U.S.C. Secs. 841(a)(1), (b)(6), 846 (1982). All but Albert Papolos and one other defendant were found guilty.
 Count nine charged appellants Stephen Papolos, Michael Ferrentino, Bernard Johnson, and Linda Ferrentino with interstate travel in aid of racketeering. 18 U.S.C. Secs. 2, 1952 (1982). All were convicted; one other defendant was acquitted.
 Count ten is not relevant to this appeal.
 
 
 [2]
 The charges in the indictment relating to the venture's money laundering activities are as follows
 Counts eleven, twelve, and thirteen charged appellants George Meros and Robert Papolos with utilizing a wire transfer in foreign commerce to facilitate unlawful activity, 18 U.S.C. Sec. 1952 (1982), conspiring to commit an offense against or to defraud the United States, 18 U.S.C. Sec. 371 (1982), and traveling in foreign commerce to facilitate unlawful activity. 18 U.S.C. Secs. 2, 1952 (1982). Meros and Robert Papolos were convicted on all three counts; one other defendant was charged in counts twelve and thirteen, but found innocent.
 Counts fourteen through twenty-five charged appellant George Meros with violating currency transaction requirements. 31 U.S.C. Secs. 1081, 1059 (1976); 18 U.S.C. Secs. 2, 1001 (1982). Meros was convicted of counts fourteen through twenty-two, and count twenty-five; Meros was found innocent of counts twenty-three and twenty-four.
 
 
 [3]
 Appellants' other challenges are without merit; we dispose of them in an unpublished opinion issued simultaneously with this published opinion
 
 
 [4]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981
 
 
 [5]
 In their briefs, appellant Meros urges us to reverse our previous decisions and take the position adopted by several of our sister circuits. Initially, we note that under the rules of the Eleventh Circuit, only the en banc court may reverse established precedent. Even, however, if we could depart from our previous decisions, we would not do so. We consider our approach to the instant provisions as mandated both by the language of the statutes involved and by the intent of the Congress
 
 
 [6]
 Section 841(b)(6) was repealed on October 12, 1984. See Comprehensive Crime Control Act of 1984, Pub.L. No. 98-473, Sec. 502(5), 98 Stat.2069. Under the new sentencing scheme, individuals convicted of offenses involving over 1000 kilograms of marijuana are subject to a 10 year to life term of imprisonment, a $4,000,000 fine, and a minimum 5 year special parole term. See 21 U.S.C. Sec. 841(b)(1)(A) (Supp. IV 1986). The statutory construction question that we decide in the instant case is thus not relevant to the current statutory penalty scheme
 
 
 [7]
 In Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981