685 So.2d 1224 (1996)
Robert Patrick CRAIG, Appellant, Cross-Appellee,
v.
STATE of Florida, Appellee, Cross-Appellant.
No. 82642.
Supreme Court of Florida.
October 3, 1996.
Rehearing Denied January 8, 1997.
*1225 James B. Gibson, Public Defender and James R. Wulchak, Chief, Appellate Division, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, for Appellant, Cross-Appellee.
Robert A. Butterworth, Attorney General; and Margene A. Roper and Mark Dunn, Assistant Attorneys General, Daytona Beach, for Appellee, Cross-Appellant.
PER CURIAM.
Robert Patrick Craig appeals the death sentences imposed upon him at a second resentencing. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
The State entered into a plea bargain with Craig's codefendant, Robert Schmidt, whereby Schmidt was permitted to plead guilty to two counts of second-degree murder for the murder of John Smith Eubanks and Walton Robert Farmer. As part of the bargain, Schmidt agreed to testify against Craig. Craig was subsequently convicted of two counts of first-degree murder for the deaths of Eubanks and Farmer. The facts surrounding the murders are set forth in Craig v. State, 510 So.2d 857 (Fla.1987)(Craig I), cert. denied, 484 U.S. 1020, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988). The jury recommended life imprisonment for the murder of Eubanks and death for the murder of Farmer. The trial judge overrode the jury recommendation with regard to Eubanks' murder and imposed two death sentences. We affirmed the convictions but remanded for resentencing by the trial judge.
When the resentencing was held some four and one-half years after remand,[1] the original trial judge had left the bench for private practice. The new judge assigned to the case instructed the parties by written order that in conducting the resentencing proceeding he would consider only evidence of Craig's good prison conduct prior to his sentencing. After considering that evidence, he imposed two death sentences.
On appeal, we ordered a new penalty-phase proceeding before a jury because the trial judge imposing the death sentences at issue on appeal was not the same judge who had presided over the original penalty phase in violation of Corbett v. State, 602 So.2d 1240 (Fla.1992) (holding that judge imposing sentence after remand must be same judge who presided over penalty phase). Craig v. State, 620 So.2d 174 (Fla.1993)(Craig II). Because Craig was legally entitled to the original jury's life recommendation for the murder of John Eubanks, we instructed the trial court that the new jury should be impaneled to recommend a sentence only for the murder of Farmer. Id. at 176. On remand, the jury recommended death for the murder of Farmer by a seven-to-five vote. The trial judge imposed a sentence of death for each of the murder convictions.[2]
*1226 On appeal, Craig raises six claims: (1) the prosecutor deliberately misled the jury as to the disparate treatment of his codefendant; (2) the trial court erroneously admitted evidence that was irrelevant to the sentencing for Farmer's murder; (3) the trial court erroneously admitted hearsay testimony; (4) the trial court erred in denying his request for individual jury instructions on specific nonstatutory mitigators; (5) the trial court erred in finding (a) two new statutory aggravators for Eubanks' murder and, (b) one new aggravator for Farmer's murder which had not been found by the trial court in the original sentencing proceeding; and (6) Craig's death sentences were impermissibly imposed because the trial court's findings were insufficient, the sentences were based on improper aggravators, the trial court did not consider relevant mitigators, and the trial court erroneously overrode the jury's life recommendation with respect to Eubanks' murder. The State cross-appeals the trial court's finding as a mitigating circumstance that Craig had no significant history of prior criminal activity. We find claims (1) and (5)(a) to be dispositive and claims (2), (3), (4), (5)(b) and (6) rendered moot by our decision here. We address the State's claim on cross-appeal only for purposes of remand.

GIGLIO CLAIM
First, we address Craig's claim that a new penalty proceeding is necessary because the prosecutor misled the jury concerning the disparate sentence received by his codefendant, Robert Schmidt.[3] Craig contends that the prosecutor in this case withheld material evidence relating to Schmidt's prison status, failed to correct material false evidence presented on this issue, and used Schmidt's misleading testimony as to his status during closing argument to obtain a death sentence for Craig in violation of United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and Routly v. State, 590 So.2d 397 (Fla.1991).
To establish a Giglio violation, Craig must show: (1) that the testimony was false; (2) that the prosecutor knew the testimony was false; and (3) that the statement was material. Id. If there is a reasonable possibility that the false evidence may have affected the judgment of the jury, a new trial is required. Giglio, 405 U.S. at 154, 92 S.Ct. at 765; Routly, 590 So.2d at 400. We noted in Routly that under Giglio and Bagley, "the prosecutor has a duty to correct testimony he or she knows is false when a witness conceals bias against the defendant through that false testimony." 590 So.2d at 400; see also United States v. Meros, 866 F.2d 1304, 1309 (11th Cir.), cert. denied, 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). We further stated, "The thrust of Giglio and its progeny *1227 has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and that the prosecutor not fraudulently conceal such facts from the jury." Id. (quoting Smith v. Kemp, 715 F.2d 1459, 1467 (11th Cir.), cert. denied, 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983)); accord Alderman v. Zant, 22 F.3d 1541, 1554 (11th Cir.1994).[4]
Craig asserts that the State presented evidence and argument during the penalty-phase proceeding that Schmidt was serving two consecutive life sentences for the murders and would continue to serve those sentences although the State knew that Schmidt had already been placed in a work-release program in preparation for his parole. Specifically, Craig challenges testimony elicited from Schmidt by the prosecutor, and argument by the prosecutor, that Schmidt was not only serving these sentences, but the prosecutor had continuously and successfully blocked Schmidt's efforts to obtain parole or early release. Craig cites the following excerpts as examples:
Q. What happened to your charges?
A. Due to a plea bargain, I had them reduced to second degree murder if I would give truthful testimony in the murders of John Smith Eubanks and Robert Walton Farmer.
Q. Did you plead guilty to second degree murder?
A. Yes, sir, I did, two counts.
Q. And what was the sentence imposed on you by the judge?
A. Six months to life and six months to life consecutive.
. . . .
Q. You're currently eligible for parole?
A. Yes, sir, I am in March of 1995.
Q. Have I appeared at your last three parole hearings?
A. Yes, sir, you've successfully stopped my parole.
Q. Have I given you any reason to believe that either I or the State Attorney's Office will not continue to make every effort to block your parole?
A. No, I think you told my attorney you would continue to stop my parole the best that you could.
Q. You don't expect any further benefit from the State Attorney's Office for testifying here today?
A. No, sir, nothing.
Craig also challenges the following statement made during the prosecutor's closing argument:
I will tell you this, if you believe Robert Craig, if you believe that when he took that stand and described for you the events on July 21st, 1981, that what he told you was the truth and whole truth, then you must return a recommendation of life. If you find that he didn't tell you the truth and you find that the truth is what Robert Schmidt told you, then it's a whole other matter.
Robert Schmidt is a bad man, and I'm not here to tell you he's a nice guy. Nobody in their right mind would want him living next to them if he ever gets out of prison but that isn't the question. The question is when he took the stand and told you the same thing he told another jury in 1981, he was telling you the truth.
In trying to decide between Robert Schmidt on the one hand and Robert Craig on the other as to who you can believe, I think there are several things you can look to. Now, [on] the cross examination of Robert Schmidt[,] Miss Blair asked him that in 1981 he was facing a possible death sentence himself, yes, he was. He was facing a possible first degree murder conviction, yes, he was, that gave him a very powerful motive to lie, yes, it did, but for *1228 Robert Schmidt that motive is no longer there but for Robert Craig it is very much there. Robert Craig had the same motivation to lie today than Robert Schmidt ever would have had and that Robert Schmidt no longer has.
Now, Robert Schmidt could be prosecuted for perjury if he came in and lied to you and that might or might not affect his parole date but that's a very weak incentive to lie compared to the one that Robert Craig has.
Robert Schmidt told you I know you blocked my parole three times. I know you're going to be there trying to do it again, I know I'm not going to be getting out of this, but I'll tell it to you one more time. So when you consider the motives here of who has the motive to tell the truth and who does not, weigh that.
Here, the prosecution posed the proper and critical choices to the jury, the credibility and culpability of the codefendants. But the prosecution also painted a clear picture of a codefendant serving two consecutive life sentences as to whom the prosecution had continuously, and successfully, fought tooth and nail to oppose any early release. The prosecutor told the jury that the codefendant was a bad man that no one would want as a neighbor, "if he ever gets out of prison." He further stated that if Schmidt gave false testimony, "that might or might not affect his parole date." And, finally, the prosecutor told the jury:
Robert Schmidt told you I know you blocked my parole three times. I know you're going to be there trying to do it again, I know I'm not going to be getting out of this, but I'll tell it to you one more time. So when you consider the motives here of who has the motive to tell the truth and who does not, weigh that.
The prosecutor did everything possible to convey to the jury that Craig's codefendant would never be released from prison. But all this time, the prosecutor knew, while the defense and the jury did not, that the codefendant testifying against Craig already had been granted work release.
Each defendant in this case took the position that his codefendant was the real instigator of the murders. The entire outcome of this case turns on the resolution of that conflict. It is undisputed that Schmidt, who made a favorable deal with the State and testified against Craig at both the original trial and the sentencing at issue here, actually murdered one victim and fired the fatal shot into the second after that victim was gunned down by Craig.[5] In determining Craig's sentence for participating in the murder of Farmer, the jury had the responsibility of assessing not only the culpability of each of these defendants, but their credibility as well. In so doing, the jury had to consider and weigh any disparity in penalties between Craig and his codefendant. See Malloy v. State, 382 So.2d 1190, 1193 (Fla.1979); Slater v. State, 316 So.2d 539 (Fla.1975). The jury also had a duty to consider the actual treatment received by Schmidt from the State.
In light of these facts, we find that the State deprived the jury of critical information regarding codefendant Schmidt's disparate sentence in violation of Giglio and Routly. First, the testimony elicited from Schmidt and the prosecutor's subsequent argument to the jury about Schmidt's prison status presented a false and misleading picture to the jurythe co-perpetrator-witness was actually in a work-release program with a presumptive parole release date in the near future. Second, the prosecutor conceded that he knew Schmidt was on work release prior to eliciting testimony from him and prior to his argument to the jury. Thus, the prosecutor knew the testimony and argument were misleading. Finally, the misleading statements were material to the outcome in this case as they affected the jury's view of Schmidt's credibility and the true disparity of *1229 sentencing between these defendants.[6] Because the jury was unaware of the true sentencing disparity between Craig and his codefendant,[7] it was prevented from properly evaluating the codefendant's credibility and weighing the mitigating circumstances in this case. That is, because the prosecutor failed to disclose that Schmidt was already on work release and selling carpets to the public at the time he testified against Craig at sentencing, the jury considered a sentencing disparity between Craig and a codefendant who was serving two consecutive life sentences with, at best, a bleak possibility of parole. In fact, the jury should have considered a sentencing disparity between Craig and a codefendant who was, at that very instant, already out on work-release and preparing for re-entry into society.
The actions of the prosecutor also violated other established rules of conduct which recognize that our adversary system of justice has its limitations in the prosecution of criminal cases, and especially capital cases. The resolution of such cases is not a game where the prosecution can declare, "It's for me to know and for you to find out." Long ago, the United States Supreme Court made clear the standard we should apply in situations like this:
The [government] Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigorindeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful [result] as it is to use every legitimate means to bring about a just one.
Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). The Oath of Admission to the Florida Bar states, in part, that an attorney "will employ for the purpose of maintaining the causes confided to me such means only as are consistent with truth and honor, and will never seek to mislead the Judge or jury by any artifice or false statement of fact or law." Rules of the Supreme Court, 145 Fla. 763, 797 (Fla.1941). Under these standards, the conduct of the prosecutor here was clearly improper.
Given the jury's great responsibility in sentencing, and the jury's consideration of the sentence received by Schmidt as a factor in evaluating Schmidt's credibility and in recommending a sentence for Craig, we find that the prosecutor had a duty to disclose Schmidt's work release status. Even without this information, the jury's vote recommending death was seven to five, a one-vote margin between a recommendation for death or one for life. Because the conduct of the prosecutor undermines our confidence in the outcome of this sentencing proceeding before a jury, we vacate Craig's sentence of death and remand for a new sentencing proceeding before a new judge and jury.[8]

OTHER ISSUES
We also agree that the trial judge here erred in finding two additional aggravators for the murder of Eubanks. In the original penalty proceeding, the trial judge overrode the jury's life recommendation for *1230 that murder, finding three aggravating factors: (1) the murder was committed for financial gain; (2) the murder was heinous, atrocious, or cruel; and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. As previously stated, we struck the heinous, atrocious, or cruel aggravator on appeal, 510 So.2d at 868, and remanded the case with instructions that the trial court resentence Craig for both murders and additionally consider only the penalty-phase testimony concerning Craig's good conduct while in jail from the time of his arrest until sentencing. Id. at 870.
When the case came before us a second time, we remanded for a new penalty proceeding as to the murder of Farmer, but gave Craig the benefit of the jury's life recommendation for his murder of Eubanks. Craig II, 620 So.2d at 176. Because Craig was entitled to the previous jury's life recommendation, the jury impaneled upon remand in this third sentencing proceeding did not make a sentencing recommendation for that murder. See Heiney v. State, 620 So.2d 171, 174 (Fla.1993); Buford v. State, 570 So.2d 923, 924 (Fla.1990). Nevertheless, the trial judge, in overriding the original jury's life recommendation for the murder of Eubanks, found two additional aggravators: (1) Craig was previously convicted for the murder of Farmer; and (2) the murder was committed to avoid arrest.
Our decision giving Craig the benefit of the original sentencing jury's life recommendation fixed as ultimate facts the aggravating factors found by the trial judge who considered that life recommendation. Because of the importance attributed to the jury's recommendation under our death penalty statute, we conclude that where a resentencing follows a jury override the resentencing judge may consider only those aggravating factors that were considered by the original sentencing jury.[9] In this case, the trial judge was responsible for resentencing Craig for the murder of Eubanks after considering the original jury's life recommendation. Consequently, the trial judge was required to perform an analysis pursuant to Tedder v. State, 322 So.2d 908 (Fla.1975), to determine whether there was a reasonable basis for the jury's life recommendation.[10] In this anomalous situation, the trial judge had to consider all the evidence which has been presented, old and new, with respect to statutory and nonstatutory mitigators,[11] but was limited to considering only the two aggravating factors previously considered by the jury.
Because we conclude that it was improper for the trial judge in his Tedder analysis and subsequent weighing to consider two additional aggravators which were not contemplated by the jury in making its recommendation, we strike those additional aggravators. Moreover, our analysis of the evidence, old and new, leads us to conclude that the Tedder standard for overruling the jury's life recommendation for the murder of Eubanks has not been met. We find that the totality of the circumstances surrounding these crimes, including the disparate treatment accorded to the codefendant and the other mitigating evidence, provided a reasonable basis for the jury's life recommendation. We therefore vacate the trial judge's sentence of death for the murder of Eubanks and remand for the imposition of a sentence of life without the possibility of parole for twenty-five years.[12] The sentence is nunc pro tunc to the date of the original sentence.
*1231 Finally, we reject the State's claim that the trial court erroneously found as a mitigating circumstance that Craig had no significant history of prior criminal activity. The trial court explained:
By his own admission, the defendant used cocaine prior to and during his employment at the ranch. Although advocated by the state, the court does not consider the cattle thefts as a rebuttal for this mitigating factor since the cattle thefts are an integral part of this case. While defendant has admitted use of cocaine, the court does not find this would constitute "significant" prior criminal activity, and thus, finds that this mitigating circumstance exists. The court has given this mitigating circumstance slight weight.
The proper standard for determining if a mitigating circumstance is invalid is whether the judge abused his discretion in finding that circumstance. Scull v. State, 533 So.2d 1137 (Fla.1988), cert. denied, 490 U.S. 1037, 109 S.Ct. 1937, 104 L.Ed.2d 408 (1989). We find evidence in the record to support the trial court's conclusion that the cattle thefts were substantially related to the murders. Cf. Pardo v. State, 563 So.2d 77, 80 (Fla.1990) (rejecting the trial court's view of the defendant's crimes as one lengthy criminal activity where each crime was "singular, discrete, and only tenuously related to the other episodes"), cert. denied, 500 U.S. 928, 111 S.Ct. 2043, 114 L.Ed.2d 127 (1991). Consequently, we conclude that no abuse of discretion occurred here.

CONCLUSION
In conclusion, we vacate the sentences of death and remand for (1) a new sentencing proceeding before a jury for the murder of Walton Farmer and (2) imposition of a sentence of life imprisonment without the possibility of parole for twenty-five years for the murder of John Eubanks.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW and ANSTEAD, JJ., concur.
HARDING, J., concurs in part and dissents in part with an opinion, in which GRIMES, J., concurs.
WELLS, J., concurs in part and dissents in part with an opinion, in which GRIMES, J., concurs.
HARDING, Justice, concurring in part and dissenting in part.
I concur with that portion of the majority opinion which vacates Craig's sentence of death for the murder of John Smith Eubanks and remands for the imposition of a life sentence without the possibility of parole for twenty-five years. Majority op. at 1229-1231. I also concur in the majority's conclusion that the trial court did not abuse its discretion in finding as a mitigating circumstance that Craig had no significant history of prior criminal activity. Id. at 1230-1231.
However, I dissent from the majority's decision to vacate the death sentence imposed for the murder of Walton Robert Farmer. The majority finds "that the State deprived the jury of critical information regarding codefendant Schmidt's disparate sentence in violation of Giglio[ v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)] and Routly[ v. State, 590 So.2d 397 (Fla.1991)]." Majority op. at 1228. I do not find that the record supports this conclusion. The trial court was asked to grant a new sentencing proceeding before a jury on the basis of a discovery violation. Specifically, defense counsel argued that the State had failed to disclose that Craig's codefendant Schmidt was in a work-release program and that this information might have produced a different sentencing result if presented to the jury. The court ruled that no discovery violation had occurred because the evidence of Schmidt's work release was available to both the prosecution and the defense before the sentencing proceeding. Based upon this record, I find it inappropriate for the majority to reverse and remand on the basis of a Giglio violation when that issue was not raised below and thus is not available for *1232 appellate review. See Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982) ("[I]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.").
GRIMES, J., concurs.
WELLS, Justice, concurring in part and dissenting in part.
I concur with that portion of the majority's decision vacating the sentence of death for the murder of John Smith Eubanks and remanding for the imposition of a sentence of life without the possibility of parole for twenty-five years. I also concur with the majority's decision to affirm the trial court's finding of the "no significant history of prior criminal activity" mitigator. I dissent from the majority's decision to vacate the death sentence imposed for the murder of Walton Robert Farmer.
Appellant argues and the majority finds that a reversal of the death sentence is warranted on the basis of the decisions in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and Routly v. State, 590 So.2d 397 (Fla.1991). Although Craig relies on these two cases in his appeal, he did not contend in his motion to the trial judge that they applied to the work-release issue.
Schmidt's work release was presented to and considered by the trial court as a discovery issue. The record reflects that after the jury made its sentencing recommendation but prior to the judge's imposition of sentence, Craig's counsel learned that Schmidt was in a work-release program. As a result of that discovery, defense counsel moved for a continuance of the sentencing proceeding before the trial judge or in the alternative for a new sentencing trial. At the hearing on this motion, Craig claimed the State failed to disclose exculpatory material evidence. Specifically, defense counsel contended:
[T]he prosecutor should have provided us with this information and did not do so.... [T]here's a reasonable possibility [sic] that the evidence, if it had been disclosed to the Defense, may have produced a different result....
I think that under these circumstances where you have a seven to five vote and the jury was out for such a long time, a fact like this is one that would be very significant to someone because it was actually represented during trial that Mr. Schmidt had a good chance of spending the rest of his life in jail. When Mr. Baker, our investigator, talked with DOC officials, we were told that a work release program such as that that Mr. Schmidt is now in, and we have confirmed that he is in a work release program, is one that it is known in the DOC as the road to release, and its purpose is ... for gradual re-entry back into society to establish employment, community ties, and financial means for release.
After defense counsel presented his argument, the trial judge pointed out that he had not yet made a sentencing decision. The trial judge then asked whether defense counsel was equating this situation to a Richardson[13] type violation. Counsel responded affirmatively, and the trial judge thereafter gave Craig the opportunity to present testimony supporting his contention that a discovery violation had occurred.
In response to Craig's request for a continuance, the State argued that it had not suppressed any evidence and that, consequently, no discovery violation took place. The State alleged that Schmidt's address had been timely provided by the prosecution to Craig's counsel and that Schmidt had been available for deposition or interview at the supplied address prior to the resentencing trial.
The trial court addressed Craig's motion as one alleging nondisclosure of exculpatory evidence and concluded that no discovery violation occurred because evidence of Schmidt's work release was available to the prosecution and defense before the sentencing *1233 trial. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), does not impose upon the prosecution a duty to disclose exculpatory evidence that is equally available to the prosecution and defense. See Roberts v. State, 568 So.2d 1255 (Fla. 1990) (finding no Brady violation where prosecution and defense have same access to alleged exculpatory evidence); James v. State, 453 So.2d 786 (Fla.) (same), cert. denied, 469 U.S. 1098, 105 S.Ct. 608, 83 L.Ed.2d 717 (1984). To avoid the due-diligence factor of Brady and to secure a standard of materiality that is more beneficial to his cause,[14] Craig now couches in terms of a Giglio violation the issue he raised below. The majority decision erroneously approves Craig's distortion of the issue.
The issue Craig raises should be considered on the basis of Brady because we are dealing with nondisclosure rather than false testimony. Moreover, as the trial court determined, the issue should be dismissed without merit because the record reflects that evidence of Schmidt's work release was available to the prosecution and defense, and defense counsel simply made a decision not to utilize discovery.
Giglio clearly is not applicable here. In Giglio, the Court determined that a new trial was warranted because a coconspirator falsely testified that he was never told he would receive immunity if he testified before the grand jury. Initially, the majority correctly states that Giglio and its progeny apply only to cases in which the State allows a witness to testify falsely and the false testimony which conceals bias against the defendant is material. Thereafter, the majority either confuses the distinction between Giglio and Brady or extends Giglio without acknowledging that it does so.
In discussing Giglio in United States v. Meros, 866 F.2d 1304, 1309 (11th Cir.), cert. denied, 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989), the Eleventh Circuit pointed out that the prosecutor has no duty to correct that which is not false. The testimony and argument Craig challenges in this case were not false. Schmidt accurately testified regarding the sentence he received and his parole status. His testimony indicated that he did not receive anything from the prosecutor in exchange for his current testimony. Defense counsel's discovery that Schmidt was on work release did not render this testimony false.
The majority, in reaching its decision that Giglio and Routly require reversal, focuses primarily on statements made by the prosecutor in closing rather than on Schmidt's testimony. The majority writes that the "prosecutor's subsequent argument to the jury about Schmidt's prison status presented a false and misleading picture to the jury the co-perpetrator-witness was actually in a work-release program with a presumptive parole release date in the near future." However, the portion of the prosecutor's argument that appellant challenges was not false. In closing, the prosecutor merely reiterated that Schmidt was not receiving a benefit for his testimony in this proceeding and, consequently, that Schmidt, unlike appellant, had no motive to lie. Giglio and Routly are thus inapplicable to the prosecutor's statements.
Finally, I conclude that in light of the testimony presented in this case indicating that Schmidt had received sentences of six months to life and that he was eligible for parole consideration in March 1995, the jury was sufficiently informed of the differences between Schmidt's and Craig's sentences. Accordingly, I do not think that the statements Craig challenges were material because there is no reasonable probability that had Schmidt's work release been disclosed to the defense, the result of the proceeding *1234 would have been different.[15]
GRIMES, J., concurs.
NOTES
[1] We emphasize, as we did in our review of Craig's second sentencing proceeding, that resentencing should be conducted in a timely manner and that four and one-half years from the time of remand is not timely.
[2] The trial judge found the following aggravators: (1) Craig was previously convicted of the premeditated murder of Eubanks; (2) the murder was committed for the purpose of avoiding arrest; (3) the murder was committed for pecuniary gain; (4) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. See § 921.141(5)(b), (e), (f), (i), Fla. Stat. (1993).

The trial judge found and gave the following statutory mitigators slight weight: (1) Craig had no significant history of prior criminal activity; and (2) Craig's age at the time of the trial. See § 921.141(6)(a), (g), Fla. Stat. (1993). The judge also found the following nonstatutory mitigators and gave them very slight weight: (1) good prison conduct while awaiting trial; (2) plea bargain and lesser sentence of codefendant; (3) defendant's remorse; (4) defendant's intelligence level; (5) defendant's work habits; (6) defendant's childhood background; (7) defendant's family role; (8) possibility of rehabilitation; (9) defendant's religious background since his arrest; (10) defendant's good character; (11) defendant's lack of violence prior to these crimes; and (12) defendant's positive personality traits.
Although the trial judge found that the same aggravators and mitigators applied to Farmer's and Eubanks' murders, he made separate findings which were specific to each murder for each aggravating and mitigating circumstance.
[3] The State summarizes the underlying circumstances on this issue in its brief:

After the penalty phase had been completed, the defense asked for a continuance at the sentencing hearing on September 24, 1993. The defense claimed to have just learned that Schmidt was on a work release program and was selling carpet to the public. Mr. Baker, the defense investigator, talked with DOC officials and confirmed that Schmidt is in a work release program, the purpose of which is for gradual re-entry into society. The defense argued that the prosecutor's statements to the jury were inconsistent with that fact. The defense claimed that the prosecutor had argued that Schmidt had a good chance of spending the rest of his life in jail. Defense counsel indicated that the jury was out for approximately five hours and came back with a 7-5 vote for death and the undisclosed fact that Schmidt was now out on the streets could have impacted their decision. Counsel requested a continuance, a new trial, and a new jury.
[4] See also Dupart v. United States, 541 F.2d 1148 (5th Cir.1976), wherein the Fifth Circuit analyzed the testimony of a government witness in light of the Giglio standard and further noted that "assuming the allegations to be true, such a formalistic exchange of testimony even though technically not prejurious, would surely be highly misleading to the jury, a body generally untrained in such artful distinctions." Id. Accord United States v. Ruiz, 711 F.Supp. 145 (S.D.N.Y. 1989) (restating the Giglio rule that "if conviction was obtained through the use of false or misleading evidence which was known to be so by the government, the conviction cannot stand."), aff'd, 894 F.2d 501 (2d Cir.1990).
[5] The State has provided us with a parole commission order of October 18, 1994, suspending Schmidt's presumptive parole release date, in which the commission states: "Schmidt first killed Eubanks, shooting him in the back of the head, and then continued, firing the fatal shot which killed Farmer." Craig not only claims that Schmidt shot the victims, but claims that Schmidt was the motivating and controlling force in the murders.
[6] Moreover, the prosecutor expressly argued to the jury that their sentencing verdict should turn on whether the jury believed or disbelieved Schmidt.
[7] This disparity is augmented by the fact that the codefendant is an admitted triggerman in both killings.
[8] We recognize that the State sometimes has to make hard choices to successfully prosecute a case. Sometimes the State may rightly choose to permit a codefendant to plead to lesser charges and avoid the risk of the death penalty in exchange for his testimony against a remaining defendant. That choice is not in question here. However, once the choice is made, the full circumstances and consequences thereof should not be withheld from a sentencing jury. That is the concern here.
[9] We recognize an exception to this rule where the original sentencing jury did not consider an aggravator due to a legal error. See Spaziano v. State, 433 So.2d 508, 511 (Fla.1983), aff'd, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984).
[10] In Craig I, we extensively considered and rejected Craig's claim that the Tedder standard had not been met. Craig I, 510 So.2d at 870. However, our prior approval of the jury override in that case was not binding on the trial court in this third sentencing proceeding. Buford, 570 So.2d at 924.
[11] As we did in Buford, 570 So.2d at 924 n. 3, we recognize that the original sentencing jury in this case did not hear the additional mitigating evidence which must now be considered in determining whether the life recommendation was reasonable.
[12] We note that in 1994, the legislature eliminated parole eligibility for persons convicted of first-degree murder and sentenced to life imprisonment. See § 775.082(1)(a), Fla. Stat. (Supp. 1994); ch. 94-228, § 1, Laws of Fla. Then, in 1995, the legislature expanded the ban on parole for life-sentenced defendants to cover all capital felonies. See § 775.082(1)(a), Fla. Stat. (1995); ch. 95-294, § 4, Laws of Fla. Because Craig committed his crime on July 21, 1981, he is not eligible to receive a life sentence without the possibility of parole.
[13] Richardson v. State, 246 So.2d 771 (Fla.1971).
[14] In nondisclosure cases, the evidence is material if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. See United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). In cases where the prosecutor knowingly uses false testimony, the testimony is considered material unless failure to disclose it would be harmless beyond a reasonable doubt. Bagley, 473 U.S. at 678-80, 105 S.Ct. at 3381-82.
[15] I emphasize that I use the standard of materiality applied to Brady claims rather than Giglio claims because I find that Brady rather than Giglio is applicable here. See Bagley, 473 U.S. at 678-82, 105 S.Ct. at 3381-83.