UNITED STATES of America

v.

David Ronald CHANDLER,
a/k/a Ronnie Chandler.

Nos. CR90-H-266-E, CV95-H-8006-E.

United States District Court,
N.D. Alabama,
Eastern Division.

Dec. 17, 1996.

John R. Martin, Natasha Zalkin, Atlanta, GA, for Plaintiff.

Harwell G. Davis, III, U.S. Attorney's Office, Huntsville, AL, for Defendant.

**ORDER REGARDING CLAIMS SET FORTH IN SECTIONS III A, III B, AND III C OF DEFENDANT'S MOTION TO VACATE AND FOR A NEW TRIAL**

HANCOCK, Senior District Judge.

Currently before the Court is defendant Chandler's motion, pursuant to 28 U.S.C. § 2255 and Rule 33, Fed.R.Crim.P., to vacate his conviction and sentence and for a new trial. That conviction and sentence have been affirmed. *See United States v. Chandler*, 996 F.2d 1073 (11th Cir.1993), *reh'g and reh'g en banc denied*, 5 F.3d 1501 (11th Cir. 1993), *cert. denied*, 512 U.S. 1227, 114 S.Ct. 2724, 129 L.Ed.2d 848 (1994), *reh'g denied*, 512 U.S. 1277, 115 S.Ct. 23, 129 L.Ed.2d 922 (1994). The instant motion has been amended several times; the most recent version of the motion was filed on October 10, 1995, and this version was amended to add one new claim on January 18, 1996. Also pending before the Court is defendant's motion to conduct discovery pursuant to Rule 6 of the § 2255 Rules. That motion was filed April 6, 1995, and Chandler moved on May 11, 1995 and January 18, 1996 to expedite certain aspects of this requested discovery.

The Court has already held two evidentiary hearings: one originated from a motion by Chandler to disqualify Assistant U.S. Attorney Harwell Davis from further participation in this case and was held on May 30, 1995.[1] Pursuant to the October 11, 1995 Order, the other hearing addressed those claims set forth in sections III D through III O of the motion to vacate that the Court believed a hearing was necessary to resolve. This latter hearing was held on October 31, November 1, and November 3, 1995. The Court has also received extensive briefing from both parties on the issues contained in sections III D through III O, and these issues have been under submission.

Pursuant to the August 15, 1995 and October 12, 1995 Orders, the parties have conferred regarding the need for an evidentiary hearing on the claims raised by Chandler, and defendant has proffered the substance of the testimony he expects to be able to present regarding sections III A, B, and C of the motion to vacate. The government has challenged almost all of the facts asserted in Chandler's proffer.

The purpose of the current Order is threefold: (1) to address the merits of those claims in sections III A, B, and C that the Court believes can be resolved as a matter of law; (2) to set an evidentiary hearing for those claims that cannot be resolved on the current record; and (3) to delineate those areas in which defendant will be allowed to conduct discovery. The Court's analysis of these three issues will proceed on a claim-by-claim basis through sections III A, B, and C of the motion to vacate and for a new trial, as amended.

### III A: *Giglio claims*

■ Section III A of Chandler's motion alleges that the government knowingly offered numerous pieces of false evidence. *See Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 268–70, 79 S.Ct. 1173, 1176–78, 3 L.Ed.2d 1217 (1959). In order to succeed on these claims, Chandler must show (1) that the evidence was, in fact, false; (2) that the government knew that it was false; and (3) that the false evidence was "material" to the outcome of the trial. *See Tejada v. Dugger*, 941 F.2d 1551, 1556 (11th Cir.1991). "False testimony becomes material when 'there is any reasonable likelihood that [it] could have affected the jury.'" *Id.* A *Giglio* claim can be predicated on false evidence that bears either on the defendant's guilt or a witness's credibility. *See Brown v. Wainwright*, 785 F.2d 1457, 1465 (11th Cir.1986).

### III A 1 a: Charles Ray Jarrell

■ Chandler's petition and proffer of evidence asserts that Charles Ray Jarrell was forced by the government to give false testi-

---

1. Although the May 30, 1995 hearing was originally intended to resolve only factual questions about the motion to disqualify, the July 25, 1995 Order makes it clear that the scope of the hearing was expanded, at defendant's request, to address the merits of some of Chandler's § 2255/Rule 33 claims. *See* 7/25/95 Order at 3.

**1528**

mony at Chandler's trial. The proffer asserts that Charles Ray Jarrell told both Cole and Kirby (state investigators) and Hubbard (Calhoun County District Attorney and Special Prosecutor for the USA) that his trial testimony would be false.

The parties have stipulated that an evidentiary hearing will be required on this issue, and the Court agrees. The details regarding the hearing will be set forth at the end of this Order.

In addition, since an evidentiary hearing will be required on this issue, the Court will also grant defendant permission to conduct discovery regarding Charles Ray Jarrell's statements to Cole, Kirby and Hubbard. The specifics regarding discovery are also set out at the end of this Order.

*III A 1 b:* Melissa McFry

Melissa McFry testified at trial and implicated Chandler in the apparent murder of Jeff McFry.[2] (Tr. 4–137). Now, she has recanted her testimony, saying that the government forced her to lie at trial.

█ The Court has already had an evidentiary hearing on this issue and has had the opportunity to observe Melissa McFry first hand. As part of its July 25, 1995 Order, the Court made a finding of fact that Melissa McFry's trial testimony was not false. Defendant has offered one additional piece of evidence on this claim, the testimony of Deborah Chandler, to corroborate Melissa McFry's recantation. This additional proffered evidence, however, does not warrant an evidentiary hearing. Deborah Chandler's proffered testimony consisted of Melissa McFry's declaration, immediately after defendant's trial, that Melissa McFry's trial testimony was false. The strength of this evidence is thus directly tied to Melissa McFry's credibility. Since the Court has already heard the testimony of Melissa McFry herself, the proffered testimony of Deborah Chandler cannot change the Court's earlier finding of fact. Pursuant to that find-

ing, the Court finds that claim III A 1 b is due to be denied.

*III A 1 c:* Billy Jo Jarrell

Defendant asserts that Billy Jo Jarrell's trial testimony, which related an offer of money by defendant for the murder of Marlin Shuler, was false and that the government knew of its falsity. Billy Jo Jarrell has recanted his trial testimony and now claims that the government forced him to commit perjury at defendant's trial.

█ The Court has already received the testimony of Billy Jo Jarrell. As part of its July 25, 1995 Order, the Court made a finding of fact that Billy Jo Jarrell's trial testimony was not false. Again, defendant has proffered additional evidence in support of this claim, in the form of threats by Cole and Kirby to induce Billy Jo to testify. This additional evidence does not require an evidentiary hearing because it would not affect the Court's earlier finding on the core issue of the falsity of Billy Jo Jarrell's trial testimony. That finding requires the Court to deny claim III A(1)(c).

*III A 1 d:* Toby Barnwell

Toby Barnwell testified at trial about a conversation wherein Chandler implicated himself in the apparent murders of Patrick Burroughs and Jeff McFry. (Tr. 4–150 to – 52). Barnwell has not recanted, but Chandler offers the testimony of Joe and William Barnwell and "Junior" Shell. The proffered testimony seeks to establish two facts: (1) that the witnesses were present during the alleged conversation and that Chandler said nothing about McFry or Burroughs; and (2) that Toby Barnwell, before or during Chandler's trial, made declarations that implied that the government was forcing him to fabricate his trial testimony.

The key issue with regard to this claim would be the government's knowledge that Toby Barnwell's testimony was false. To

---

**2.** Chandler was not charged with the murder of Jeff McFry; rather, the government offered evidence implicating Chandler in the apparent murders of both McFry and Patrick Burroughs as Rule 404(b) evidence to help establish Chandler's

intent to kill Marlin Shuler, as alleged in Count III of the superseding indictment. The government's theory at trial was that the three murders were all actions taken by Chandler to protect his marijuana operation from interference.

prove this fact, Chandler proffers three pieces of evidence. First, Chandler offers the testimony of Joe and William Barnwell (Toby Barnwell's father and brother), to the effect that Barnwell declared that the government was pressuring him to cooperate and testify. Second, Chandler offers the testimony of William Barnwell, which relates a declaration by Toby Barnwell that "they [the government] said it would look really good about getting my sentence reduced if I could put something in about Burroughs and McFry in my testimony." Third, Chandler offers the testimony of Joe Barnwell, which relates an incident in which Toby Barnwell was being interviewed by Harwell Davis and allegedly exclaimed "you don't want to know the truth!"

■ The Court does not believe that an evidentiary hearing is required for either of the first two pieces of proffered evidence. The testimony about Toby Barnwell's cooperation under pressure from the government has little or no probative value on the issue of whether the government knowingly offered false testimony; it is equally plausible, from this testimony, that the government was pressuring him to testify truthfully. The second piece of evidence does not require a hearing because it is inadmissible hearsay. According to the proffer, someone connected with the government told Toby Barnwell that he should "put something about Burroughs and McFry" in his testimony. Toby Barnwell repeated this remark to William Barnwell, who now wants to testify about Toby Barnwell's declaration. Conceivably, the first hearsay statement of the government official might fit into an exception to the hearsay rule, but the Court is convinced that Toby Barnwell's declaration to William Barnwell is hearsay that cannot fit into any exception. In essence, Toby Barnwell's statement to William Barnwell is the assertion of a fact remembered (the declaration by the government official) that is offered to prove the fact that the government actually asked Toby Barnwell to "put something in his testimony" about Chandler's involvement in the Burroughs and McFry disappearances. As such, it is inadmissible hearsay. *See* Fed.R.Evid. 803(3).

■ The third proffered item of evidence also fails to warrant an evidentiary hearing. Initially, the Court is convinced that Toby Barnwell's alleged declaration cannot be considered "material" to the outcome of Chandler's trial. Joe Barnwell's only proffered testimony is that the declaration was made; he cannot testify about the context in which it was made, leaving the trier of fact to speculate as to the relevance of the remark. Evidence of such tenuous significance is, as a matter of law, not "material." However, even assuming that Toby Barnwell's declaration is "material," the Court believes it would be inadmissible hearsay. In effect, Joe Barnwell would be testifying about Toby Barnwell's assertion that Harwell Davis didn't care about the truth, and that testimony would be offered to prove the truth of that matter. Chandler might argue that Toby Barnwell's statement was an excited utterance admissible under Rule 803(2). The problem with this argument is that Joe Barnwell's testimony cannot establish the necessary predicate that Toby Barnwell made the statement while under the stress of excitement from some startling event. Joe Barnwell's lack of personal knowledge about the context of Toby Barnwell's remark makes it impossible for Chandler to justify admission of Toby Barnwell's statement under Rule 803(2).

Finally, the Court is convinced that the proffered evidence would necessarily have to be excluded from admission under Rule 403. As noted above, Toby Barnwell's statement has very little probative value, and could not support any inference that the government knowingly offered false, *material* testimony without speculation about the context of the statement. In addition, the Court believes that the evidence is unfairly prejudicial to the government, because it implicates prosecutor Harwell Davis in wrongdoing. Chandler filed a motion to disqualify Davis from further participation in this case on April 6, 1995. In essence, that motion alleged that Davis had been implicated in various incidents of misconduct in connection with the preparation of witnesses for Chandler's trial. The Court held an evidentiary hearing on that motion on May 30, 1995, and entered an

Order on July 25, 1995 rejecting Chandler's claims of misconduct. For whatever reason, the issue of Davis' interview with Toby Barnwell was not presented in the motion or at the hearing, and it would be unfair to allow Chandler to offer Toby Barnwell's statement. The Court has already given Chandler the opportunity to present evidence of Davis' alleged wrongdoing, and has concluded that Davis may continue to participate in this case. Allowing Toby Barnwell's statement to be admitted would again place Davis in the position of having to take the witness stand to rebut Joe Barnwell's testimony, and the Court concludes that the unfair prejudice the government would suffer as a result substantially outweighs the limited probative value of the evidence.

For these reasons, claim III A 1 d is due to be denied.

*III A 1 e:* Raymond Pointer

At Chandler's trial, Raymond Pointer testified to the effect that Chandler had made offers to pay for the murders of a number of people, including Marlin Shuler. (Tr. 4–76 to –78). Defendant takes the position that Raymond Pointer has a mental disorder that causes him to lie compulsively, and that the government was apprised of this fact by Donna Fay Reaves and Geraldine Hancock.

■ The Court has already heard the evidence defendant has to offer on this claim, and no additional hearing has been requested. The Court now concludes that defendant has failed to prove a *Giglio* claim.

The main flaw in Chandler's claims about Raymond Pointer is that the evidence presented to the Court fails to show that the government intentionally presented testimony that was known to be false. At most, the evidence suggests that Pointer had a reputation for lying, but does not show that either his trial testimony was false or that the government knew it was false at the time of trial. The government does not violate *Giglio* and *Napue* simply by offering the testimony of a witness that has made prior inconsistent statements or who has a poor reputation for truthfulness. *See, e.g., Hays v. Alabama,* 85 F.3d 1492, 1499 (11th Cir.

1996) (no *Giglio/Napue* violation for government to present testimony inconsistent with witness's earlier statements). Here, as in *Hays,* the government can argue that it had evidence to corroborate Pointer's testimony, such as the testimony of Toby Barnwell, Melissa McFry, and Billy Jo Jarrell—all of whom testified to incidents similar to that related by Pointer. This claim asks the Court to make the improper leap from the government's alleged knowledge of Pointer's poor reputation for truthfulness to a finding that the government knew that Pointer's testimony was false. The evidence presented by defendant does not justify this conclusion, and so claim III A 1 e is due to be denied.

*III A 1 f:* Greg Cole

Greg Cole, an agent with the Alabama Bureau of Investigation (ABI), testified at trial that he had not threatened Charles Ray or Billy Jo Jarrell with the electric chair in order to induce them to testify. (Tr. 9–99, 9–112 to –13). This testimony, according to Chandler, was false.

As noted above, the Court has already heard testimony from Billy Jo Jarrell as part of the May 30, 1995 hearing. In its July 25, 1995 Order, the Court found Billy Jo Jarrell's testimony lacking in credibility. To the extent that claim III A 1 f relates to threats allegedly made by Cole to Billy Jo Jarrell, it is due to be denied on the basis of the Court's earlier finding of fact.

■ However, with respect to threats allegedly made to Charles Ray Jarrell, the Court believes that an evidentiary hearing will be required on this claim.

*III A 1 g:* Paul Watson

At Chandler's trial, Paul Watson testified that Chandler had said that he had planted 5,000 marijuana plants for harvest in 1990. (Tr. 3–109). According to defendant's proffered evidence (the testimony of Watson himself), Watson told Harwell Davis that the 5,000 plant figure was a "bragging" exaggeration, and that the real amount of marijuana harvested by Chandler that year was 263 pounds. Nevertheless, according to Watson,

Davis presented only the 5,000 plant testimony at trial. According to Chandler, this alleged conduct by Davis amounted to a *Giglio* violation because Davis knowingly offered misleading testimony. *See Troedel v. Dugger*, 828 F.2d 670 (11th Cir.1987), *affirming* 667 F.Supp. 1456 (S.D.Fla.1986).

■ Assuming *arguendo* that Watson's trial testimony was misleading, the Court is convinced that it was not "material" to the trial's outcome. In order to convict Chandler under § 848, the government only needed to prove that Chandler's marijuana operation was large enough to generate "substantial income." *See* 21 U.S.C. § 848(c)(2)(B). The Court is certain that 263 pounds of marijuana would yield the seller "substantial income" sufficient to support a conviction under § 848.[3] In addition, the difference between 5,000 plants started and 263 pounds harvested has no real logical connection to a core issue involved in Chandler's trial—the procurement of the Shuler murder. Finally, the government introduced overwhelming evidence of the size of Chandler's marijuana operation, including evidence from Agent Jay Howell to the effect that a marijuana plot book connected to Chandler's operation contained location information for 5,083 plants. Even if Watson's trial testimony was misleading and the government knew about its misleading nature, it was not "material" to defendant's conviction. Thus, claim III A 1 g is due to be denied.

*III A 1 h:* Agent Howell

Another witness offered by the government at trial to prove the size of Chandler's marijuana operation was Agent Howell, who testified about a correlation between marijuana plots recorded in a book attributed to Chandler and actual plots in the field. *See* Tr. 7–58 to –84. Chandler takes the position that there was only a tenuous correlation between the book and the actual plots, and so Howell's trial testimony was false.

■ The Court believes that Howell's trial testimony was neither false nor material. As an initial matter, the degree of correlation

between the book and the actual plots is largely a matter of subjective opinion. Howell testified that there was a "rough" correlation between the two, and the evidence proffered by Chandler does not so contradict Howell's statement that his testimony can be properly characterized as "false."

In addition, Howell's testimony, even if false, was not material to Chandler's conviction. As noted above, the government only needed to show a marijuana operation large enough to generate "substantial income." And, as the Court has observed, once the threshold of "substantial income" has been reached, the size of Chandler's crop is not logically connected to the issue of whether Chandler paid Charles Ray Jarrell to kill Marlin Shuler. Thus, the Court concludes that the Howell testimony was not "material."

Because Chandler has not shown Agent Howell's testimony to be either false or material, claim III A 1 h will be denied.

*III A 1 i:* Agent Skinner

Skinner, an agent with the Georgia Bureau of Investigation (GBI), arrested Chandler in Conyers, Georgia in connection with an attempted large-scale marijuana purchase. According to Skinner's trial testimony, Chandler fled when Skinner attempted to arrest him. After chasing Chandler down, Skinner attempted to bring Chandler under control, at which time Chandler attempted to grab Skinner's gun and turn it on Skinner. (Tr. 6–68 to –69).

■ Chandler takes the position that this testimony was false, and that the government knew about its falsity because Skinner's arrest reports and testimony before a Georgia magistrate judge (attached to the motion to vacate as Exhibits B, C, and D) omit any discussion of the gun-grabbing incident. The Court does not agree. The documents submitted by Chandler recite that Chandler fled when Skinner tried to arrest him, and that a "scuffle" ensued when Skinner caught Chandler. The Court does not believe that Skinner's report of a "scuffle" is so inconsistent

---

3. Paul Watson also testified at trial that he had purchased 25 pounds of marijuana from Chandler for $37,500. Chandler does not argue that this testimony was false or misleading.

with his trial testimony that the Court can conclude that Skinner's trial testimony was false or that the government knew of its falsity. On the contrary, Skinner's trial testimony is wholly consistent with his earlier reports of a "scuffle" with Chandler. The fact that he supplied more details at trial does not, without more, establish that his trial testimony was false or that the government knew that it was false. Claim III A 1 i is therefore due to be denied.

### III B: *Brady* claims

■ Section III B of Chandler's motion to vacate alleges that the government failed to disclose numerous pieces of exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In order to be *Brady* material, the evidence must be "suppressed" by the government, that is, the defendant did not possess the information and could not have discovered it through the exercise of reasonable diligence. *Mills v. Singletary*, 63 F.3d 999, 1014 (11th Cir.1995). "Favorable" evidence can be either substantive evidence or evidence used solely for impeachment, and can relate to either guilt or punishment. *Kyles v. Whitley*, 514 U.S. 419, ——, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995); *Kennedy v. Herring*, 54 F.3d 678, 682 (11th Cir.1995). Finally, the evidence must be "material," that is, there must be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at ——, 115 S.Ct. at 1565. A "reasonable probability" of a different result is shown when the suppression of the evidence "undermines confidence in the outcome of the trial." *Id.*

### III B 1: Repeat of *Giglio* claims

The first *Brady* claim asserted by Chandler is merely a repetition of all of the *Giglio* claims in section III A of the motion to vacate. The court has already addressed claims III A 1 b, III A 1 c, III A 1 d, III A 1 e, III A 1 f (to the extent it relies on allegations concerning conversations between Greg Cole and Billy Jo Jarrell), III A 1 g, III A 1 h, and III A 1 i, and essentially for the same reasons therein expressed, claim III B 1 is

due to be denied to the extent it relies upon the allegations in claims III A 1 b, III A 1 c, III A 1 d, III A 1 e, III A 1 f (to the extent it relies on allegations concerning conversations between Greg Cole and Billy Jo Jarrell), III A 1 g, III A 1 h, and III A 1 i.

### III B 2 a: Failure to disclose police statements regarding Marlin Shuler's abuse of family members

Chandler argues that the government violated *Brady* by failing to turn over various police records of domestic disturbances caused by Marlin Shuler. These were relevant, according to Chandler, to show Charles Ray Jarrell's alternate motive for killing Shuler.

The government contends that these police records are not "material" under *Brady* because evidence about Marlin Shuler's abuse of Donna Shuler and other family members was presented at trial. Additional evidence on the same point, according to the government, would not have made any greater impression on the jury. Additionally, the government notes that Shuler's abusive behavior and Charles Ray Jarrell's resentment of that behavior was known to Chandler's trial counsel, and so was not "suppressed."

■ The Court agrees that the information regarding Shuler's abuse of Donna Shuler and others is not "material" under *Brady*, and that Chandler's trial counsel was aware of the underlying facts in question. The trial transcript contains testimony from Billy Jo Jarrell establishing that Marlin Shuler was extremely abusive, including several specific incidents. Billy Jo testified that Marlin had beaten Donna severely several times, causing her to receive stitches in her head once. In addition, Billy Jo testified that Marlin Shuler had destroyed Donna's car. (Tr. 8–154). Charles Ray Jarrell, under questioning from Chandler's trial counsel, testified that Marlin Shuler had abused Donna and other family members. (Tr. 4–45 to –46). In addition, Charles Ray testified that he had previously threatened to kill Shuler, (Tr. 4–43), and related an incident wherein he actually attempted to shoot Shuler in the head with a pistol, but failed because the gun misfired. (Tr. 8–109 to –112).

So, the trial transcript makes it clear that the jury was informed that Shuler had abused Charles Ray's mother and half-sister. More importantly, the jury heard the most important evidence of Charles Ray's alternate motive to kill Shuler—Charles Ray's previous attempt to kill Shuler. Additional evidence regarding incidents of abuse by Shuler could not even approach the probative value of Charles Ray's admission that he had previously attempted to kill Shuler because of that abuse. Because Chandler's trial counsel presented the most powerful evidence available on this point, the Court is convinced that additional evidence of Shuler's abuse would not have been reasonably likely to affect the jury's decision. In addition, since the evidence regarding Shuler's abuse and Charles Ray Jarrell's previous attempt to kill Shuler was brought out by questioning from Chandler's trial counsel, it is obvious that this information was known to Chandler at the time of trial. It follows, then, that this information was not "suppressed." Claim III B 2 a is thus due to be denied.

*III B 2 b:* Failure to disclose the results of a polygraph test given to Charles Ray Jarrell

Chandler asserts, and the government does not deny, that Charles Ray Jarrell was given a polygraph examination while he was being held in jail in Illinois. Chandler alleges that the results of the polygraph showed that Charles Ray was not telling the truth about some aspects of his testimony. Chandler further asserts that the government's failure to turn the results of this polygraph test over constituted a *Brady* violation.

■ The Court has already concluded that an evidentiary hearing will be required to allow Chandler to present the testimony of Charles Ray Jarrell. The Court believes that an evidentiary hearing on the polygraph issue will be required as well. In addition, the Court will grant Chandler permission to discover the results of the Illinois polygraph examination given to Charles Ray Jarrell.

4. The Court does not know which law enforcement agency administered the polygraph test, and so cannot determine, at this time, whether that agency was part of the "prosecution team"

The details with respect to both the hearing and discovery are set forth at the end of this Order.[4]

*III B 2 c:* Failure to disclose an agreement not to prosecute Billy Jo Jarrell in exchange for Charles Ray Jarrell's testimony

Here, Chandler argues that the government failed to disclose the fact that Charles Ray Jarrell's trial testimony was motivated by an agreement not to prosecute Billy Jo Jarrell for the Shuler murder, in addition to the government's agreement to recommend a 25 year sentence for Charles Ray himself (which the government admitted to at trial).

■ The Court rejects this claim because the trial transcript shows it to be immaterial. The relevance of the alleged agreement not to prosecute Billy Jo Jarrell was to impeach the testimony of Charles Ray Jarrell. However, at trial, Charles Ray gave the following testimony in response to questions from Chandler's trial counsel:

Q. All right. And you came to know, didn't you, that you had been charged by a warrant sworn out by Mr. Cole, Lieutenant Cole, with conspiring with your son Billy Joe Jarrell to murder Marlin Earl Shuler?

A. Okay.

Q. You learned that, didn't you?

A. Yeah.

 \* \* \* \* \* \*

Q. Did you have any conversation with the officers [Cole and Kirby] about what they would do if you showed them where the body [of Shuler] was?

A. Yes, sir.

 \* \* \* \* \* \*

Q. And what was that conversation?

A. That they would turn Billy Joe loose without any charges on this conspiracy and drugs and all this if I'd produce them a body.

 \* \* \* \* \* \*

under *Brady*. If resolution of that issue becomes necessary, the Court will address it later, but the parties are requested *not* to submit evidence on that particular issue at the evidentiary hearing.

Q. And you knew then that Billy Joe had been charged somehow in connection with the killing of Marlin Shuler?

A. He told me that's what they had him charged with and was going to give him the electric chair.

\* \* \* \* \* \*

Q. And did you make an effort to produce a body?

A. I didn't make an effort. I did.

\* \* \* \* \* \*

Q. And the reason you did that was because of the promise that had been made to you concerning Billy Joe?

A. That's right.

Q. Otherwise you wouldn't have done it. The reason I'm asking you that part is this: I asked you the other day, and you had said on a previous occasion—I call your attention to testifying—that you didn't know why you changed your statement from a first statement that you didn't do it and then to the next statement that it was accidental and then to stating that you did it intentionally. Did the changing of your statement have something to do with Billy Joe?

A. Yes, sir.

Q. Why?

A. The boy was innocent.

Q. Why?

A. The boy is innocent, and I'm not going to see him catch no prison time for something that I done.

(Tr. 8–114 to –118).

So, Charles Ray Jarrell's trial testimony established that his cooperation with the government was motivated by an agreement not to prosecute Billy Jo—the precise fact Chandler now claims was "suppressed." Regardless of whether such an agreement actually existed, the jury knew that, in Charles Ray Jarrell's mind, the threat of Billy Jo's prosecution existed, and that fact induced him to cooperate with the government. Because the jury already heard the most reliable evidence about Charles Ray Jarrell's motivation for testifying, the Court must conclude that claim III B 2 c alleges an error immaterial to

the outcome of the trial. Claim III B 2 c is due to be denied.

*III B 2 d:* Failure to disclose evidence of Billy Jo Jarrell's involvement in the Shuler murder

Chandler alleges that the government had access to evidence implicating Billy Jo Jarrell in the Shuler murder (e.g., evidence presented to the grand jury that indicted Billy Jo for that offense), but failed to turn it over. Chandler argues that this evidence is relevant for two reasons: (1) to show that the government's alleged agreement not to prosecute Billy Jo was of great value to Charles Ray, and (2) to show that prosecutor Hubbard's closing argument regarding the dismissal of the charges against Billy Jo was false.

 The Court does not see this issue as analytically distinct from III B 2 c. If, in fact, a deal not to prosecute Billy Jo induced Charles Ray's testimony, the only really relevant evidence regarding the existence (or perceived existence) of that deal and its value to Charles Ray Jarrell came from Jarrell himself at trial. The evidence presented before the state grand jury and the actual strength of the state's case against Billy Jo is irrelevant unless it was known to Charles Ray when he decided to testify. Put another way, the information regarding the state's evidence against Billy Jo is only relevant to Charles Ray's credibility, and the jury heard Charles Ray's testimony on this issue, including Charles Ray's testimony that he knew that Billy Jo was being threatened with the electric chair. The actual evidence the state possessed against Billy Jo is not directly relevant to Charles Ray's motivation to testify, and so the Court believes that discovery and an evidentiary hearing will be unnecessary on this point.

The same is true with respect to prosecutor Hubbard's alleged false closing argument about the dismissal of the charges against Billy Jo. If, as Chandler argues, the charges against Billy Jo were dismissed because of a deal between Charles Ray and the government, the relevance of that deal would be solely to impeach Charles Ray's testimony. In other words, Hubbard's alleged false

statement in his closing argument would be a "material" *Giglio* violation only to the extent that it bore on Charles Ray's credibility. However, the jury heard Charles Ray himself testify that he cooperated with the government so that charges against Billy Jo would be dismissed. Evidence regarding the state's case against Billy Jo would add nothing to what the jury already heard, and so claim III B 2 d is due to be denied.

### III B 3: Failure to disclose an inducement given to Melissa McFry

Chandler alleges that the government failed to disclose the fact that Melissa McFry's testimony was induced by government threats to prosecute her for conspiracy. The Court has already held an evidentiary hearing and heard Melissa McFry's testimony on this point. As part of its July 25, 1995 Order, the Court made a finding of fact that Melissa McFry's testimony about this threat was not credible. That earlier finding requires the Court to deny claim III B 3.

### III B 4: Failure to disclose inducements given to Perry McFry

Perry McFry, Jeff McFry's brother, testified at trial about an instance in which he guarded a marijuana patch for Chandler for 30 days in exchange for $3,000. (Tr. 4–112 to –22). Perry McFry also admitted at trial, under cross-examination from Chandler's trial counsel, that the government had given him immunity on some drug-related charges in exchange for his testimony. (Tr. 4–123 to –24).

Chandler now alleges that two other inducements were given by the government to Perry McFry, but were not disclosed to Chandler. Chandler alleges that the government agreed not to prosecute him for the apparent murder of his brother, Jeff McFry, and also gave him lenient treatment on a DUI charge in exchange for his testimony.

The Court believes that a hearing on this claim is unnecessary. The facts alleged by Chandler, even if true, would not support relief under § 2255 because the inducements given to Perry McFry were not "material" in the sense required by *Brady*. To begin with,

Perry McFry's trial testimony was not terribly damaging to Chandler. The incident related by Perry McFry was, at most, a bit more anecdotal evidence of the existence and size of Chandler's marijuana operation, a fact that was the subject of a great deal of evidence at trial. Perry McFry gave no testimony about anything having to do with Chandler's connection to the murders of Shuler, Jeff McFry, or Patrick Burroughs. Perry McFry's testimony as a whole may have been immaterial to Chandler's conviction.

In addition to the peripheral nature of Perry McFry's testimony, Perry's testimony was already impeached at trial by his admission that the government had agreed not to prosecute him for drug-related crimes. The Court is convinced that the additional impeachment value of the inducements alleged by Chandler would have done little to undermine Perry McFry's credibility further.

Taken together, the relative unimportance of Perry McFry's testimony and the fact that the alleged inducements were similar to the inducements revealed at trial, the Court concludes that Chandler's alleged *Brady* violation with respect to Perry McFry must fail as a matter of law. The allegedly suppressed inducements simply carry no reasonable probability that the result of the trial would have been different if the inducements had been disclosed to Chandler. Claims III B 4 a and III B 4 b are thus due to be denied.

### III B 5 a: Failure to disclose a statement given by Connie Farmer

Chandler alleges that Connie Farmer told prosecutor Harwell Davis that Scott Hackney had killed Jeff McFry because Hackney was jealous of McFry's affair with Scottie Surrett. This evidence, according to Chandler, would have served to exculpate Chandler regarding Jeff McFry's disappearance.

Connie Farmer testified at the hearing held by the Court on May 30, 1995. As part of its July 25, 1995 Order, the Court made a finding of fact that Connie Farmer spoke with Harwell Davis, but said nothing exculpatory regarding Chandler beyond the information that Chandler's trial counsel already possessed in the form of the grand jury

testimony of Scottie Surrett. The Court's earlier finding requires it to deny claim III B 5 a.

*III B 5 b:* Failure to disclose a statement given by Steve Law

Chandler asserts that Steve Law informed agents Cole and Kirby of the Alabama Bureau of Investigation that Scott Hackney was very jealous of Jeff McFry's relationship with Scottie Surrett, and had previously threatened to kill McFry.

■ The Court believes that an evidentiary hearing on this issue is unnecessary, for two reasons. First, the statement given by Steve Law was not directly exculpatory of Chandler—the government's theory all along was that Chandler had paid Scott Hackney to kill McFry, and so evidence tending to show that Hackney would have been willing to kill McFry would not have served to exculpate Chandler. In addition, as the Court noted in its July 25, 1995 Order, the trial transcript shows that Chandler's trial counsel was fully aware of the underlying facts of Hackney's possible involvement in the McFry disappearance and his jealousy of the affair between McFry and Surrett. (Tr. 8–2 *et seq.*). Since Chandler's trial counsel was aware of this information, there can be no plausible claim that it was "suppressed." Claim III B 5 b is due to be denied.

*III B 5 c:* Failure to disclose results of two polygraph tests given to Hackney

Chandler alleges that law enforcement personnel gave Scott Hackney two polygraph tests, and asserts that the government failed to disclose the results of those tests to the defense.

The government does not dispute that the tests were administered, but argues that Hackney did not testify at Chandler's trial, and so his polygraph results would have been inadmissible, and thus not "material" for *Brady* purposes.

■ The Court agrees with the government. Under the standard announced in *United States v. Piccinonna,* 885 F.2d 1529 (11th Cir.1989), polygraph test results are admissible only when the parties stipulate to their admissibility or when they are used to impeach or bolster a witness's credibility. Here, Hackney did not testify at Chandler's trial, and so his polygraph results would not have been admissible under *Piccinonna.*

The Supreme Court has recently held that polygraph results are not "material" under *Brady* if they would not have been admissible at trial. *See Wood v. Bartholomew,* —— U.S. ——, ——, 116 S.Ct. 7, 10, 133 L.Ed.2d 1 (1995). Because the Hackney polygraph tests would not have been admissible at Chandler's trial, *Wood* dictates that their disclosure could not have carried any reasonable probability of changing the result at trial. Claim III B 5 c is thus due to be denied.

*III B 5 d:* Failure to disclose statements about the camouflage hat

At the grand jury stage of proceedings, the government presented the testimony of Scottie Surrett, who testified (in relevant part) that a camouflage hat found in Scott Hackney's car was similar to a hat Jeff McFry had been wearing when he was last seen. This evidence presented to the grand jury was apparently in furtherance of the government's theory that Chandler had paid Hackney to kill McFry.

Chandler asserts that the government had statements from three witnesses who all said that the hat in question did resemble McFry's hat, but was definitely not the same hat that McFry had owned. Chandler asserts that the government failed to disclose this information, and violated *Brady* as a result.

■ The Court believes that no evidentiary hearing is required here because this claim fails as a matter of law. The statements about the camouflage hat had no independent relevance to the issues in Chandler's trial—at best, they could have been used to impeach the testimony of Scottie Surrett implicating Hackney (and, therefore, Chandler) in the apparent murder of Jeff McFry. However, Scottie Surrett did not testify at trial. (Tr. 8–2 *et seq.*). The government did not present any evidence at Chandler's trial about the camouflage hat found in Hackney's car. So, the alleged statements to law en-

forcement officials about the hat would have been irrelevant at trial. It follows, then, that disclosure of these statements would not have been reasonably probable to change the result of the trial, and so there was no *Brady* violation.[5] Claim III B 5 d is thus due to be denied.

*III B 5 e:* Failure to disclose statement given by Lewis Franklin regarding payment to Hackney

During the grand jury proceedings, the government presented evidence that Scott Hackney had no money or marijuana before McFry disappeared, but had some of both afterward. This evidence was relevant to the government's theory that Chandler paid Hackney to kill McFry. Chandler asserts that the government suppressed a statement given by Lewis Franklin, Hackney's employer, to the effect that he had paid Hackney at about that time. This evidence, according to Chandler, contradicted the government's theory that the source of Hackney's newly-found money was Chandler.

■ Again, however, this evidence cannot have been "material" to the outcome of Chandler's trial, because the government did not present any evidence about Scott Hackney's wealth before and after McFry disappeared. Instead, the government implicated Chandler in the McFry and Burroughs disappearances through the testimony of Toby Barnwell and Melissa McFry. Lewis Franklin's statement would have been relevant only to rebut the government's evidence about Scott Hackney having some money after McFry disappeared, but the government presented no such evidence at trial. It is obvious, then, that the alleged statement was not "material" under *Brady*. Claim III B 5 e is due to be denied.

*III B 5 f:* Failure to disclose statements indicating that Scottie Surrett was a potential defense witness

■ The Court believes that an evidentiary hearing is required on this issue, and also believes that limited discovery would be appropriate. The specifics regarding both are set out at the end of this Order.

*III B 5 g:* Failure to disclose evidence that implicated Jack Buttram in the McFry disappearance

Chandler asserts that the government had access to two statements that implicated Jack Buttram as a person who might have killed McFry. Since the government implicated Chandler in McFry's disappearance at trial, Chandler asserts that this evidence should have been disclosed pursuant to *Brady*.

Chandler has proffered two pieces of evidence in support of this claim. The first is a document, dated September 19, 1990, that reflects an interview of Perry McFry by Perry Beasley (of the ABI) regarding Jeff McFry's disappearance. In the statement, Perry told the investigator that he believed that Jeff McFry had met with "foul play," and recited that McFry had stolen marijuana from a number of local growers, including stealing several pounds from Jack Buttram in about December 1989. The report also details an incident, three months before Jeff McFry disappeared, wherein Scott Hackney and two other men came to the McFry residence to express their displeasure with McFry's dating Pam Gilley.

■ The Perry McFry statement to investigators is extremely weak evidence. Perry McFry speculates, without any personal knowledge, that Jeff McFry has met with "foul play." He then recites that Jeff McFry had stolen marijuana from a number of local growers, including Buttram. The theft from Buttram occurred nine months before McFry disappeared; the most recent incident of hostility toward Jeff McFry is attributed to Scott Hackney. The Court believes that this

---

5. Perhaps Chandler's argument is that the grand jury would not have indicted him if the government had revealed the alleged statements about the hat to the grand jury. This argument is similarly flawed. The hat evidence was highly peripheral to the government's implication of Chandler in a crime that he was not indicted for. The Court has little difficulty in concluding that Chandler would have been indicted for the murder of Shuler, even if the grand jury had heard the hat evidence asserted to exist by Chandler.

evidence could not possibly have changed the result of Chandler's trial, and so any failure to disclose it did not violate *Brady*.

█ The second piece of evidence—the proffered testimony of Joe Barnwell—may be stronger, because it recites that Jeff McFry had stolen $50,000 worth of marijuana from Buttram three months before McFry disappeared, and also recites that Buttram had repeatedly threatened to kill McFry. According to the proffer of Joe Barnwell's testimony, Barnwell told these pieces of information to two law enforcement officials. While the Court has serious doubt that there is a reasonable probability that the result in this case would have been different had this second piece of evidence been disclosed, the Court need not reach that issue. The proffer of Joe Barnwell's testimony fails to establish what law enforcement agency or officials Barnwell gave this statement to. In this Circuit, the government is charged with knowledge of any information known to members of the "prosecution team." *See United States v. Meros,* 866 F.2d 1304, 1309 (11th Cir.1989). Usually, the "prosecution team" is defined as the prosecutors themselves and any investigative agency over which they have authority or control. *Id.* However, in cases in which state and federal law enforcement agencies cooperate, state investigative agencies that cooperate extensively with the federal investigators and prosecutors may be deemed part of the "prosecution team." *See United States v. Antone,* 603 F.2d 566, 570 (5th Cir.1979).

Here, the Court has no idea to which "law enforcement officials" Joe Barnwell made the alleged statements. Without that critical information, the Court cannot conclude that the government or any member of the "prosecution team" had the information in question. The defendant has the burden of proof on this issue, and has failed to satisfy his burden of showing that the government knew about Joe Barnwell's alleged statement.

So, the Court will deny claim III B 5 g. However, the proffer's omission of the police agency Joe Barnwell spoke to may have been accidental. The Court is willing to re-examine this claim if, within 15 days from the date of this Order, defendant can identify the law enforcement officials to whom Joe Barnwell gave the alleged statement.

*III B 6 a:* Failure to disclose evidence that David Fortenberry was an alternate suspect in the Burroughs disappearance

Chandler proffers the testimony of David Fortenberry, to the effect that Fortenberry had become angry with Patrick Burroughs at some time before Burroughs disappeared and had shot a gun over Burroughs' head. According to the proffer, Fortenberry was interviewed by "the police" about this incident.

█ Chandler claims that this evidence was relevant to show that Fortenberry had killed Burroughs, rather than Chandler. However, it suffers from the same problem as the preceding claim—Chandler has not identified the law enforcement officials to whom Fortenberry made the alleged statements regarding the shooting. Without this allegation, the Court cannot conclude that any member of the "prosecution team" had information that should have been disclosed to Chandler before trial. Claim III B 6 a is thus due to be denied, but the Court will reconsider it if, within 15 days from the date of this Order, Chandler can identify the law enforcement officials who allegedly interviewed Fortenberry.

*III B 6 b:* Failure to disclose statement of Mike Bundrum regarding Steve Donnely's possible involvement in the Burroughs disappearance

█ Chandler alleges that Mike Bundrum gave a statement to the Piedmont Police, in which Bundrum recited that Steve Donnely had admitted to killing Burroughs. The Court believes that a hearing and limited discovery are appropriate with respect to this claim. The specifics are set forth at the end of this Order.

The Court does not decide, at this time, whether the Piedmont Police Department was a member of the "prosecution team." If it becomes necessary, the Court will receive argument and evidence from the parties at a later time.

*III B 6 c:* Failure to disclose information implicating Jeffrey Roberts as a suspect in the Burroughs disappearance

According to Chandler, Jeffrey Roberts severely beat Burroughs with an axe handle before Burroughs disappeared. Chandler asserts that Roberts was interviewed by the police about this incident, and that the police were obligated to turn any records relating to the Roberts/Burroughs incident over as *Brady* material.

 The Court is convinced that this evidence cannot rise to the level of "material," favorable evidence required by *Brady*. The fact that Roberts had beaten Burroughs with an axe handle is only tenuous evidence that Roberts may have killed Burroughs. Unlike the evidence regarding Steve Donnely, there is no allegation that Roberts threatened to kill Burroughs or admitted to killing Burroughs. The fact that Burroughs and Roberts had engaged in a fight does not tend to exculpate Chandler in Burroughs' subsequent disappearance, and so the allegations made by Chandler fail, as a matter of law, to show the suppression of material, favorable evidence in violation of *Brady*. Claim III B 6 c is thus due to be denied.

*III B 6 d:* Failure to disclose information regarding Burroughs' theft of a gasoline pump from Eddie Paris

 Chandler asserts that Burroughs stole a gasoline pump from Eddie Paris shortly before Burroughs disappeared. Chandler has proffered no evidence with respect to this claim. The Court will deny this claim as a matter of law. The fact that Burroughs may have stolen a gasoline pump from Paris shortly before he disappeared cannot, without more, support an inference that Paris either knew that Burroughs had committed the theft or that Paris retaliated against Burroughs by killing him. Thus, this evidence, if it exists, is neither favorable to Chandler nor "material" under *Brady*. Claim III B 6 d is thus due to be denied.

*III B 6 e:* Failure to disclose evidence regarding burglaries allegedly committed by Burroughs

Chandler asserts that, just prior to Burroughs' disappearance, Burroughs burglar-ized numerous residences in Piedmont. According to Chandler, a number of Burroughs' burglary victims threatened to harm Burroughs in retaliation.

 The Court concludes that this claim fails as a matter of law. The proffered evidence contains nothing that could lead a reasonable jury to infer that one of the burglary victims killed Burroughs. The mere fact of the burglaries does not indicate that someone other than Chandler killed Burroughs, absent some specific evidence that one of the victims either specifically mentioned an intent to kill Burroughs or admitted later to committing the murder. For these reasons, the information about the burglaries is neither favorable nor "material" under *Brady*. Claim III B 6 e is thus due to be denied.

*III B 7:* Failure to disclose a statement given to Harwell Davis by Paul Watson

This claim is identical to that asserted in section III A 1 g. According to Chandler, Paul Watson told Harwell Davis that the actual amount of marijuana harvested by Chandler in 1990 was 263 pounds. Davis did not reveal this alleged statement to the defense.

The Court has already concluded that Watson's alleged statement, even if true, was not "material" to the outcome of Chandler's trial. It follows that Davis' alleged failure to disclose it cannot constitute a *Brady* claim. Claim III B 7 us due to be denied.

*III B 8:* Failure to disclose a statement given to Harwell Davis by Sherry McDill

Chandler alleges that Harwell Davis interviewed Sherry McDill during Chandler's trial, and that McDill told Davis that Donna Shuler was not a "big time drug dealer" for Chandler. Since the government's theory at trial was that Chandler had ordered Marlin Shuler killed because he had informed on Donna Shuler's sales of drugs for Chandler, Chandler asserts that this statement should have been disclosed under *Brady*.

The Court continued the May 30, 1995 hearing in order to allow the defense to

present Sherry McDill's testimony, but she was never called as a witness. However, as part of its July 25, 1995 Order, the Court made a finding that the alleged statement given to Davis by McDill was not favorable or material under *Brady*. That earlier finding controls this issue, and so claim III B 8 is due to be denied.

*III B 9:* Failure to disclose statements regarding the Snow's Lake land transaction

Chandler contends that J.W. Sadler, Ronald Folsom, and David Wheeler gave statements to investigators to the effect that they sold land near Snow's Lake to John and Irene Chandler (defendant's parents), not to David Ronald Chandler. The Snow's Lake land transaction was presented as an instance of money laundering at Chandler's trial, and so the defense claims that these statements should have been disclosed.

■ The flaw in this claim is that the trial transcript shows that Chandler's trial counsel was aware of the alleged true buyers of the Snow's Lake land. At trial, the defense called Ronald Folsom to the stand, who testified that he had sold the land in question to Chandler's parents. (Tr. 8–78 to –81). The deed from Folsom and Sadler to John and Irene Chandler was introduced as an exhibit at trial. (Govt's Ex. 81). Chandler cannot not claim that this information was unknown to him at trial. Because Chandler clearly knew about this evidence at trial (and, in fact, introduced it at trial), this evidence was not "suppressed" in violation of *Brady*. Claims III B 9 a, III B 9 b, and III B 9 c are thus due to be denied.

*Assessment of Cumulative Prejudice under Brady*

The Court has denied claims III B 2 a, III B 2 c, III B 2 d, III B 4, III B 5 c, III B 5 d, III B 5 e, III B 6 c, III B 6 d, III B 6 e, III B 7, III B 8, III B 9 a, III B 9 b, and III B 9 c on the ground that Chandler has failed to demonstrate prejudice from the alleged suppression of evidence. However, prejudice under *Brady* is measured collectively, taking into account all of the suppressed evidence. *See Kyles v. Whitley,* —— U.S. ——, ——, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995).

■ However, Chandler has also failed to demonstrate overall prejudice under *Brady*. The information Chandler claims was suppressed was, in many instances, wholly irrelevant to the issues at Chandler's trial or was actually presented to the jury at trial. Other evidence, such as that regarding the Burroughs and McFry disappearances, was only remotely connected to the issue of Chandler's intent to kill Shuler; that intent was established directly by the testimony of Charles Ray Jarrell. In addition, the allegedly suppressed evidence regarding Burroughs and McFry only weakly suggests that someone other than Chandler might have been involved, and evidence of such slim probative value regarding Rule 404(b) evidence is inadequate to demonstrate prejudice under *Brady*. Finally, the alleged suppression of Paul Watson's statement about Chandler's actual 1990 marijuana harvest was of no consequence, because many other witnesses established the immense size of Chandler's marijuana operation. These witnesses testified about Chandler's preparation and planting of hundreds of marijuana fields, Chandler's purchase of thousands of pounds of fertilizer, and many purchases of large amounts of marijuana by Chandler through Patrick Treacy in Texas and Fred Moncrief in Georgia. The single statement by Paul Watson that Chandler alleges was suppressed could not have lessened the impact of this accumulated evidence.

So, weighing the materiality of all of the evidence allegedly suppressed, the Court concludes that Chandler has failed to show prejudice under *Brady*.

*III C: Newly Discovered Evidence*

■ Chandler also asserts that he has recently discovered numerous pieces of evidence that warrant a new trial under Rule 33. In order to receive a new trial based on newly discovered evidence, a defendant must show each of the following five elements:

(1) the evidence was, in fact, discovered after trial;

(2) the defendant exercised due care before trial to find the evidence;

(3) the evidence is not merely cumulative or impeaching;

(4) the evidence is material; and

(5) the evidence is of such a nature that a new trial would probably produce a different result.

*United States v. Lee,* 68 F.3d 1267, 1273–74 (11th Cir.1995). Of note is the fact that the materiality standard for newly discovered evidence is much stricter than that for *Giglio* or *Brady* claims—in order to receive a new trial, the defendant must establish that the newly discovered evidence would probably change the result of the trial. "The district court should use 'great caution' in granting a new trial motion based on newly discovered evidence." *United States v. Garcia,* 13 F.3d 1464, 1472 (11th Cir.1994).

*III C 1:* Recantation of Charles Ray Jarrell

▬ The Court believes that an evidentiary hearing and discovery are appropriate with respect to this claim. The details are set forth at the end of this Order.

*III C 2:* Recantation of Melissa McFry

As noted above, the Court's July 25, 1995 Order contained a finding of fact that Chandler had failed to prove that Melissa McFry's trial testimony was false. That finding of fact disposes of this claim. Claim III C 2 is due to be denied.

*III C 3:* Evidence rebutting Toby Barnwell's trial testimony

Toby Barnwell's trial testimony included his relation of a conversation at a Piedmont area restaurant in which Chandler was reported to have said that he had killed Burroughs and that McFry was next. (Tr. 4–152). According to Toby Barnwell's trial testimony, both Joe Barnwell and "Junior" Shell were present at that conversation. (*Id.*). Chandler now proffers the testimony of those two individuals, to the effect that they were indeed present, but heard no mention of Burroughs or McFry.

▬ This evidence fails to support Chandler's motion for a new trial for two reasons. First, it is relevant only to rebut the testimony of Toby Barnwell on an issue that was not directly related to the crime for which Chandler was convicted. Chandler simply cannot show that it is probable that he would have been acquitted (or received a non-death sentence) if the jury had believed that someone else killed Burroughs and McFry. The prosecution introduced a great deal of evidence directly linking Chandler to the murder of Marlin Shuler, and the jury convicted Chandler of Shuler's murder, not those of Burroughs and McFry. The evidence regarding Burroughs and McFry was important Rule 404(b) evidence of Chandler's intent, but the Court cannot imagine that the jury would probably have not convicted Chandler of the Shuler murder if it had heard the testimony of Joe Barnwell and Junior Shell. At most, these two witnesses would have neutralized the testimony of Toby Barnwell regarding the Huddle House conversation, but the jury had also heard evidence from Charles Ray Jarrell, Raymond Pointer, and Billy Jo Jarrell that established nearly identical facts regarding Chandler's intent to kill Shuler. The testimony of Joe Barnwell and Junior Shell would not have affected the jury's assessment of these witnesses at all. Thus, Chandler cannot show that his trial would probably have produced a different result if the jury had been exposed to this evidence.

Second, and more importantly, Chandler was present at the conversation in question, and so was obviously aware that Joe Barnwell and Junior Shell were also present. If Chandler did not make the statements in question, he would have been aware at the time of trial that Joe Barnwell and Junior Shell could support his recollection of the incident. Thus, the testimony of Joe Barnwell and Junior Shell cannot be "newly discovered" to Chandler, regardless of whether he told his trial counsel about Joe Barnwell and Junior Shell. *See, e.g., United States v. Luna,* 94 F.3d 1156, 1161–62 (8th Cir.1996); *Lee v. Murphy,* 41 F.3d 311, 315 (7th Cir. 1994); *Shore v. Warden, Stateville Prison,* 942 F.2d 1117, 1124 n. 5 (7th Cir.1991).

Because the presence of Joe Barnwell and Junior Shell at the conversation in question was within Chandler's knowledge at the time of trial, and because that testimony would probably not have resulted in a different result at trial, claim III C 3 is due to be denied as a matter of law.

*III C 4:* Evidence regarding Raymond Pointer's tendency to lie

As noted above with respect to claim III A 1 e, the Court has already heard testimony from witnesses offered by Chandler to the effect that Raymond Pointer was a compulsive liar. The Court has already rejected the *Giglio* claim based on this evidence, and is also compelled to reject it as a basis for a new trial.

The "newly discovered" evidence regarding Raymond Pointer fails to support Chandler's motion for a new trial because this evidence is relevant solely for the purpose of impeachment. Raymond Pointer's propensity for lying would have been completely irrelevant at Chandler's trial, except to impeach Pointer's testimony. Because newly discovered evidence cannot warrant a new trial when the evidence is pertinent only for impeachment, *United States v. Lee*, 68 F.3d 1267, 1273–74 (11th Cir.1995), claim III C 4 fails as a matter of law.

*III C 5:* Recantation of Billy Jo Jarrell

This claim is nearly identical to claim III A 1 c, and is similarly controlled by the finding of fact made by the Court on July 25, 1995. The Court has observed Billy Jo Jarrell's testimony and has concluded that Chandler has failed to prove that Billy Jo's trial testimony was false. It follows that claim III C 5 must be denied.

*III C 6:* Alleged perjury of Lt. Greg Cole

This claim is essentially identical to that asserted in section III A 1 f of the motion to vacate. The Court has already determined that an evidentiary hearing is required with respect to this claim, insofar as it relates to Cole's testimony about Charles Ray Jarrell's incentives to testify against Chandler. However, to the extent that claim III C 6 rests on Chandler's allegations regarding conversa-

tions between Cole and Billy Jo Jarrell, it is due to be denied, since the Court has already determined that Billy Jo Jarrell's testimony on this point is not credible.

*III C 7:* Evidence implicating Jimmy Steed in the Burroughs disappearance

Originally, section III C 7 of the motion to vacate was filed *in camera* and under seal by Chandler. Shortly thereafter, the government made a motion to reveal the contents of section III C 7, which was denied as moot by the Court on April 14, 1995. Apparently, the contents of section III C 7 had been revealed to the government by Chandler's counsel. Thereafter, section III C 7 of the motion remained under seal, but the parties began filing proffered evidence and other information regarding section III C 7 openly and not under seal. As a result, all of the details of section III C 7 are now available in the unsealed file of this matter, and the Court sees no further need to keep the originally-filed section III C 7 under seal.

Section III C 7 alleges that Jimmy Steed had admitted to Joey Gowens on a number of occasions that Steed had killed Burroughs. Chandler has proffered the affidavit of Gowens to this effect, and the record also contains the transcript of a telephone conversation between Gowens and Steed in which the two discuss the location of a body (presumably that of Burroughs) and whether it might be discovered.

This claim fails as a matter of law for the same reason as claim III C 3: the proffered evidence cannot satisfy Chandler's burden of showing that a new trial would probably produce a different result. As noted above, the evidence regarding Chandler's possible involvement in the apparent murder of Burroughs was Rule 404(b) evidence of Chandler's intent to kill Shuler. However, that intent was also established by the testimony of Melissa McFry (regarding threats made by Chandler to kill Jeff McFry), Raymond Pointer, Billy Jo Jarrell (both reciting offers of money by Chandler for the murder of Shuler), and Charles Ray Jarrell. The jury concluded that Chandler had procured the murder of Shuler, and the Court is convinced

that the jury would probably have returned the same verdict even if it had believed that someone other than Chandler had killed Burroughs. Claim III C 7 is thus due to be denied.

*III C 8:* Paul Watson's testimony .

■ This claim is nearly identical to claim III A 1 g. Chandler asserts that Paul Watson knew the correct amount of marijuana harvested by Chandler (263 pounds), and that Chandler discovered this information after trial.[6]

This claim fails, as a matter of law, because the "newly-discovered" testimony of Watson cannot possibly satisfy the strict standard for granting a new trial under Rule 33. The jury could easily have convicted Chandler even if it had heard Watson's testimony regarding the 263 pound figure. In addition, the trial transcript is full of evidence regarding the size of Chandler's marijuana operation—the government presented evidence about transactions in Texas and Georgia involving many thousands of dollars, as well as Chandler's activities of buying large amounts of fertilizer and plowing and planting extensive marijuana patches. The jury concluded from all of this evidence that Chandler's drug operation generated "substantial income," as required by § 848(c)(2)(B), and Paul Watson's testimony could not have changed that conclusion. Claim III C 8 thus is due to be denied.

*III C 9:* Donna Shuler's testimony

Chandler asserts that Donna Shuler was unavailable at the time of trial (because she was a fugitive), and proffers her testimony about the horrible abuse committed by Marlin Shuler. This evidence is said to be relevant to Charles Ray Jarrell's alternative motivation to kill Shuler.

■ The court rejects this claim as a matter of law. First, the evidence of Marlin Shuler's abusive behavior cannot be "newly discovered," because Chandler's trial counsel elicited testimony about it at trial from

Charles Ray and Billy Jo Jarrell. Donna Shuler's testimony may have been unavailable, but Chandler could have (and did) present evidence of Marlin Shuler's abuse at trial. Donna Shuler's testimony is merely cumulative of evidence presented at trial.

In addition, the Court cannot conclude that the jury's decision would probably have been different had it heard Donna Shuler's testimony. The jury was told about Shuler's abuse of Donna Shuler and other family members, and also heard the most important piece of evidence regarding Charles Ray Jarrell's independent motive to kill Shuler—the evidence of Charles Ray's earlier attempt to kill Shuler. Chandler's trial counsel emphasized this testimony in his closing argument, but the jury concluded that Charles Ray's shooting of Shuler was motivated by Chandler's offer of money, not Shuler's abuse of Charles Ray's family. Given the proceedings at trial, the Court concludes that Chandler cannot prove that the testimony of Donna Shuler would probably have caused the jury to reach a different conclusion. Claim III C 9 is thus due to be denied.

*Conclusion*

In accordance with the foregoing discussion, it is ORDERED, ADJUDGED, and DECREED as follows:

(1) the following claims in defendant's March 20, 1995 motion to vacate and for a new trial, as amended on July 24, 1995, September 5, 1995, and January 18, 1996, are DENIED:

—claim III A 1 b;

—claim III A 1 c;

—claim III A 1 d;

—claim III A 1 e;

—claim III A 1 f, to the extent it relies upon allegations of conversations between Greg Cole and Billy Jo Jarrell;

—claim III A 1 g;

—claim III A 1 h;

—claim III A 1 i;

6. The Court does not understand how Chandler can claim that he discovered the actual amount of marijuana he personally harvested after trial. Chandler surely was aware of this information himself, and was certainly also aware that there might have been witnesses (such as Watson) who could have testified on this point.

—claim III A 2;

—claim III B 1, to the extent it relies upon the allegations in claims III A 1 b, III A 1 c, III A 1 d, III A 1 e, III A 1 f (to the extent claim III A 1 f relies upon allegations of conversations between Greg Cole and Billy Jo Jarrell), III A 1 g, III A 1 h, and III A 1 i;

—claim III B 2 a;

—claim III B 2 c;

—claim III B 2 d;

—claim III B 3;

—claim III B 4 a;

—claim III B 4 b;

—claim III B 5 a;

—claim III B 5 b;

—claim III B 5 c;

—claim III B 5 d;

—claim III B 5 e;

—claim III B 6 c;

—claim III B 6 d;

—claim III B 6 e;

—claim III B 7;

—claim III B 8;

—claim III B 9 a;

—claim III B 9 b;

—claim III B 9 c;

—claim III B 10;

—claim III C 2;

—claim III C 3;

—claim III C 4;

—claim III C 5;

—claim III C 6, to the extent it relies on allegations concerning conversations between Greg Cole and Billy Jo Jarrell;

—claim III C 7;

—claim III C 8;

—claim III C 9; and

—claim III C 10.

(2) Claims III B 5 g and III B 6 a in the motion to vacate are DENIED. However, the Court will reconsider these claims if, within fifteen days from the date of this Order, defendant amends his proffer of evidence to specify which law enforcement officials Jo Barnwell and David Fortenberry gave statements to regarding the issues raised in these two claims.

(3) It is ORDERED that section III C 7 of defendant's March 20, 1995 motion to vacate, which is currently filed under seal, is UN-SEALED.

(4) It is further ORDERED that the Court GRANTS permission for defendant to conduct discovery in the following areas:

(a) Defendant may discover, through requests for document production or by subpoenas, the records of any interviews of Charles Ray Jarrell conducted by prosecutor Hubbard, Lieutenant Cole, or Deputy Kirby;

(b) Defendant may discover, through requests for document production or by subpoena, any records relating to the polygraph examination given to Charles Ray Jarrell in Illinois;

(c) Defendant may discover, through a request for document production, any records of interviews of Scottie Surrett by any employee of the United States Attorney's Office; and

(d) Defendant may discover, through a request for document production or by a subpoena, any records of statements given to the Piedmont Police Department by Mike Bundrum relating to the investigation of Patrick Burroughs' disappearance.

(5) Except to the extent that permission has been granted for discovery, defendant's April 6, 1995 motion for discovery, May 11, 1995 motion to expedite certain discovery, and January 18, 1996 motion to expedite discovery are DENIED. It is further ORDERED that all discovery by defendant must be completed by January 31, 1997. It is further ORDERED that defendant, when he makes discovery requests to the government, shall also provide a list of documents already in defendant's possession that fit within the discovery requested. The government shall not be required to produce documents already in defendant's possession.

(6) It is ORDERED that an evidentiary hearing is SET for February 10, 1997 at 9:00 a.m. in Courtroom 6B of the U.S. Courthouse in Birmingham, Alabama. At this hearing, defendant will be permitted to introduce the

following evidence relating to the following claims:

(a) Defendant may present testimony and evidence regarding claims III A 1 a, III A 1 f (but only to the extent it relates to threats allegedly made by Greg Cole to Charles Ray Jarrell), III C 1, and III C 6 (but only to the extent it relates to threats allegedly made by Greg Cole to Charles Ray Jarrell). Defendant may call the following witnesses in relation to these claims:

—Charles Ray Jarrell, Sr.;

—Bobby J. Steed;

—Lona Hafley;

—Inez McDonald;

—Mary Ruth Wilkinson;

—Troy Edward McFry;

—Charles Ray Jarrell, Jr.;

—Joe Barnett;

—David Farmer;

—Jeffrey Roberts; and

—Paul Watson.

(b) Defendant may present evidence and testimony regarding claim III B 2 b. Defendant may present the testimony of Charles Ray Jarrell, Sr. with respect to this claim.

(c) Defendant may present testimony and evidence regarding claim III B 5 f. Defendant may call Scottie Surrett Bagley with respect to this claim.

(d) Defendant may present testimony and evidence regarding claim III B 6 b. Defendant may offer the testimony of Mike Bundrum on this claim.

(7) At the hearing previously described, the Court expects counsel for defendant to confine themselves to presenting evidence regarding the claims set forth above. The Court will permit the testimony of additional witnesses to be presented by defendant only on a showing of good cause. At the hearing, the Court will also receive any rebuttal evidence the government wishes to present on the issues set for hearing.